



**FILED**
8/26/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**RECEIVED**

AUG 2 5 2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
CVL

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

DAVID MANN,

Plaintiff,

v.

CHICAGO TITLE INSURANCE COMPANY; Castle Law Firm, LLC; Castle Title

Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway;

Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson;

William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE

DOES 1–25,

Defendants.

| | |
|---|---|
| Case No. ____ | 1:25-cv-10109 |
| | Judge Lindsay C. Jenkins |
| | Magistrate Judge Jeffrey T. Gilbert |
| Judge: _____ | DIRECT/Cat. 2 |

Magistrate Judge: _____

**JURY TRIAL DEMANDED**

**VERIFIED COMPLAINT**

## I. PRELIMINARY STATEMENT

1. This action arises from a coordinated scheme by buyer-side actors, their counsel, and

title/escrow personnel to hijack and depress Plaintiff's sale of **7238 S. King Drive, Chicago,**

**Illinois**. Methods included: (a) using a void, unfunded, and expired **CFCH** instrument as

leverage; (b) circulating a forged "Master Statement"/ALTA; (c) recording a Memorandum of

Contract to cloud title and coerce concessions; (d) imposing "mutual consent" to block disbursement; (e) demanding a Mutual Release; and (f) presenting pre-notarized pages for signature. (See Ex. D, pp. 42–44; Ex. E, p. 58; Ex. G, pp. 64–66; Ex. H, pp. 68–69.)These acts form part of an ongoing business practice

2. The actual end-buyer was **MBE Financial Group.** After Defendants presented the forged/fake closing packet, Plaintiff personally located **MBE's** CEO and persuaded **MBE** to close at a different title company (**Network Title**), thereby circumventing **CFCH/McElhaney.** The transaction closed on July 22, 2025 at $120,000. (See Ex. F, pp. 60–62 (Buyer: **MBE Financial Group,** Inc.; Net to Seller $98,379.11).)

3. Plaintiff had a documented $165,000 deal before the interference, evidenced by a July 5, 2025 Addendum and a July 12, 2025 Final Supersession Memorandum confirming tacit acceptance by conduct and a July 18, 2025 closing deadline. The forced close at $120,000 caused a $45,000 suppressed-equity loss. (See Ex. I; Ex. J.)

4. The forged "Master Statement" reflects Buyer draws $171,970 with inflated/false charges. Plaintiff does not seek buyer damages but pleads these figures to corroborate the enterprise's scope and pattern. (See Ex. D, pp. 42–44; compare Ex. F, pp. 60–62.)

5. Native-format emails reflect extortionate communications by **Lohrman, Krause,** and **McElhaney** leveraging the recorded Memorandum and "mutual consent" to force a release and concessions including all communications material to the complaint. Selected native .eml messages with full headers/metadata are filed as Exhibit K in PDF form; the native files will be produced in discovery .For clarity, this Complaint pleads each Defendant's role separately, with citations to the specific act, date, and exhibit (see 39B). This is not a shotgun pleading.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction under **28 U.S.C. § 1331** and **18 U.S.C. § 1964(c) (RICO)**. The Court has supplemental jurisdiction over state-law claims under **28 U.S.C. § 1367**.

7. Venue is proper in this District under **28 U.S.C. § 1391(b)** and **18 U.S.C. § 1965(a)** because a substantial part of the events occurred here, and multiple Defendants reside or transact business here, including title/escrow activities and the recording of instruments affecting real property in **Cook County, Illinois**.

## III. THE PARTIES

8. Plaintiff **David Mann** is the seller of the property at 7238 S. King Drive, Chicago, and personally suffered the losses pled.

9. **Cash For Chicago Houses, LLC ("CFCH")** is a buyer-side entity used to maintain leverage despite lack of earnest money or funded escrow. (See Ex. A; Ex. B.)

10. **Brendan McElhaney** is a principal of **CFCH** who transmitted forged ALTA materials, concealed the true buyer, and participated in coercive communications. (See Ex. D, pp. 42–44; Ex. K.)

11. **Abel Lopez** is an associate of **McElhaney** who aided retention of **CFCH** leverage and, as alleged below, changed locks and opened utilities in his own name to maintain unauthorized control of the property. (See Ex. K.)

12. **Castle Law Firm, LLC** provided legal services and communications that enabled the scheme. (See Ex. C; Ex. K.)

13. **William Lohrman** is an attorney at **Castle Law** who transmitted a fabricated post-lapse "extension" and sent coercive communications. (See Ex. C; Ex. K.)

3

14. **Brian Krause** is an attorney at **Castle Law** who sent coercive/mocking communications. (See Ex. K.)

15. **Gary Davidson** is **Castle Law**'s CEO and a named releasee in the Mutual Release. (See Ex. G, pp. 64–66.)

16. **Chicago Title Insurance Company** controlled clearance and disbursement functions material to the scheme. (See Ex. B; Ex. G.)

> 16A. Chicago Title entities. The Master Statement and closing packet display the header "Chicago Title and Trust Company" (Ex. D). On information and belief, Chicago Title and Trust Company ("CT&T") is an affiliate/authorized agent within the Chicago Title Insurance Company ("CTIC") / Fidelity National Title Group corporate family. To the extent CT&T is a separate legal entity, it acted as CTIC's agent in the subject transaction and is vicariously liable for the conduct alleged herein. Plaintiff reserves the right to add CT&T as a named defendant if discovery confirms separate corporate status. See Ex. D (image header).

17. **Richard Wagner** is **Chicago Title's** Regional VP, Chief Legal Counsel, and Regional Underwriter, and acting within the scope of his authority, he issued a July 18 ultimatum conditioning clearance on a first-buyer cancellation or a subject-to closing, stating: "Our Company is not in the business of taking on the potential outcome of litigation." (See Ex. B; Ex. G.)

18. **Nicole Holloway** is a **Chicago Title** Escrow Manager acting within scope of employment for Defendant Chicago Title Insurance Company withheld escrow verification, imposed "mutual consent," and tied disbursement to outside releases. (See Ex. B; Ex. G.)

19. **Therese Mark-Hansen** is a **Chicago Title** closing officer acting within scope of employment for Defendant Chicago Title Insurance Company who circulated the forged closing

4

documents. (See Ex. D.)

20. **John Curran** is a Castle partner/state senator named in the release who, after notice, permitted the conduct to continue by tacit omission . (See Ex. G, pp. 64–66; Ex. B.)

21. **Jay Spreadbury** is a **Chicago Title** senior underwriter acting within scope of employment for Defendant Chicago Title Insurance Company who wrote on July 17: "We have no funds to disburse." (See Ex. B.)

22. **Robin Remke** acting within scope of employment for Defendant Chicago Title Insurance Company served as closer on July 16 and presented pre-notarized pages, directing "sign under protest." (See Ex. H, pp. 68–69.)

23. **Castle Title Services, LLC** coordinated with **Chicago Title** and **Castle Law** as part of the enterprise. (See Ex. B.)

24. **John/Jane Does 1–25** are additional participants whose identities are presently unknown. Each entity Defendant is vicariously liable for the acts of its officers, employees, and agents undertaken within the scope of their duties and/or ratified after notice, including conduct itemized at 40–60 and 87–93.

24A. Capacity and Reservation. Plaintiff appears pro se in his individual capacity and is also the Successor-Trustee and a beneficiary of the Barbara J. Holmes Trust. The Trust's corpus-based damages (including the suppressed-equity delta) are pleaded to preserve notice and limitations but reserved for assertion by licensed counsel. No double recovery is sought.

## IV. FACTUAL ALLEGATIONS

A. The **CFCH** Instrument Was Void/Unenforceable

25. On May 30, 2025, Plaintiff signed a **CFCH** form agreement at $120,000 naming **Chicago Title** as escrowee and requiring an earnest-money deposit and escrow verification. No earnest money was ever deposited; escrow remained unfunded; and the instrument lapsed. (See Ex. A; Ex. B.)

26. Defendants concealed the lack of escrow/earnest money and nonetheless invoked the expired instrument as leverage to control clearance and disbursement. (See Ex. B.)

B. The Documented $165,000 Deal and Tacit Acceptance

27. On July 5, 2025, Plaintiff executed an Addendum setting $165,000 with a July 18, 2025 closing deadline. (See Ex. I.)

28. On July 12, 2025, Plaintiff issued a Final Supersession Memorandum confirming $165,000 and tacit acceptance by conduct under Illinois law. (See Ex. J.)

C. Fabricated Extension; Forged Packet; Recorded Cloud; Release Demand

29. July 14 — **Lohrman** transmitted a purported "extension" after lapse to create false continuity and block the $165,000 deal. (See Ex. C.) On July 14, Defendant **Lohrman** transmitted an 'extension letter' that was both untimely and internally inconsistent. The document bore a July 20 date while purporting to extend the closing 'through Tuesday, July 15' — a date already passed. This facial impossibility corroborates that the extension was fabricated post-lapse and wielded as leverage despite the absence of any valid contract. See Ex. C.

30. On July 15–16, Defendants circulated a forged 'Master Statement'/ALTA showing inflated and false charges, including a line item 'Buyer draws $171,970' (Ex. D, pp. 42–44). This fabricated packet inflated seller expenses by at least $12,571, directly contrasting with the clean Network Title closing statement (Ex. F, pp. 60–62). The forged closing packet contained

completed notary blocks before signing, and parties non-privy to the transaction (**CFCH**)
underscoring that the instrument was prepared in bad faith for coercive use.not a clerical mistake
but a deliberate scheme, inserting **CFCH**—a non-party—into disbursement flows, proving
Defendants fabricated authority to divert funds.

30A. On July 16, closer Robin Remke presented Plaintiff with pre-notarized pages, directing him
to 'sign under protest' (Ex. H, pp. 68–69). Photographs show Plaintiff's handwriting 'Signed
under protest' on the same page as the inflated line item 'Buyer draws $171,970.' This proves
the ALTA packet was not only forged but also presented with irregular notarial practices in direct
violation of the **Illinois Notary Public Act, 5 ILCS 312/6-102**. The photograph (Ex. H, p. 69) is
direct visual proof: Plaintiff's handwritten 'Signed under protest' appears on the very page with
the fraudulent disbursement, tying the forgery, the notarial violation, and the coerced signature
into a single piece of physical evidence.

31. On July 15, CFCH recorded a Memorandum of Contract clouding Plaintiff's title (Ex. E, p.
58). This was done despite the underlying instrument being void for lack of consideration via
earnest money and lapse (Ex. A). The memorandum was not only false but was wielded as a
weapon of extortion: Defendants expressly tied its removal to Plaintiff's concessions, including
signing a release. This constitutes both Hobbs Act extortion (§1951) and common-law slander of
title. CFCH recorded a Memorandum of Contract (Recorder Doc. No. 2519622258) clouding
Plaintiff's title (Ex. E, p. 58).

32. On July 17, while the fraudulent cloud on title remained, Defendants tendered a Mutual
Release & Non-Disparagement Agreement (Ex. G, pp. 64–66). The release demanded that
Plaintiff waive legal claims and refrain from disparagement as a condition of clearing title.

timing was part of a coordinated response to suppress reporting (see 53–54), further corroborating conspiracy under **§1962(d)**.

33. July 18 — **Wagner** declared the only two options were: (i) a signed cancellation by the "first buyer," or (ii) the new buyer closes subject to that first contract in **Chicago Title**'s policy, adding: "Even accepting all of the information you provided as the only facts, our Company is not in the business of taking on the potential outcome of litigation." (See Ex. B; Ex. G.)

34. Coercive communications (illustrative quotes): (a) **McElhaney** (July 14–15): "We are closing per the contract on file"; "We are ready to close. Please sign and return." (b) **Lohrman** (July 15): "Your memo is junk… If you don't close, you will be in court… Quit wasting everyone's time." (c) **Krause** (July 17): "No emojis? I am disappointed." (d) **Spreadbury** (July 17): "We have no funds to disburse." (See Ex. B; Ex. K (native emails on USB).)

D. Plaintiff's Intervention with **MBE** and Close at **Network Title**

35. After seeing the forged/fake packet, Plaintiff identified and contacted MBE Financial's CEO directly. **MBE** agreed to close at **Network Title**, not through **Chicago Title/CFCH**. The property closed on July 22, 2025 at $120,000, producing Net to Seller $98,379.11. (See Ex. F, pp. 60–62.)

36. On July 22, Plaintiff forced a close with MBE Financial Group at Network Title, producing a clean ALTA (Ex. F, pp. 60–62). Unlike the forged packet (Ex. D), the Network Title statement contained no inflated disbursements. This stark contrast — forged packet vs. clean close — is direct evidence of a fraudulent enterprise scheme designed to siphon equity.This side-by-side comparison — forged packet (Ex. D) vs. clean close (Ex. F) — illustrates precisely how Defendants' fabricated instruments attempted to divert over $12,000 in phantom charges, confirming the scheme was designed to siphon equity rather than facilitate a legitimate close.

This incontrovertible before-and-after comparison proves the enterprise's purpose was not settlement of a legitimate transaction, but the fraudulent siphoning of seller equity.

## V. THE ENTERPRISE

37. Defendants formed an association-in-fact enterprise with a common purpose (control of closings without lawful authority; extraction of releases; suppression of seller value), a structure (buyer — **CFCH/McElhaney/Lopez**; legal — Castle/**Lohrman/Krause/Davidson/Curran**; clearance — **Chicago Title** personnel including **Holloway/Mark-Hansen/Spreadbury/Remke/Wagner**), and continuity. (See Exs. C–H; Ex. K.)

38. Means and methods included: a fabricated post-lapse extension; concealment of unfunded escrow; forged ALTA; pre-notarization; recorded memorandum; "mutual consent" over disbursement; and release coercion. (See Exs. C–H; Ex. K.)

39. Each Defendant participated in the operation or management of the enterprise's affairs or knowingly carried out acts integral to those affairs.

- Each entity Defendant is vicariously liable for the acts of its officers, employees, and agents undertaken within the scope of their actual or apparent authority and at least in part to serve the entity's interests. This includes but is not limited to escrow, clearance, disbursement, and settlement-statement preparation functions that generated or protected premium revenue, escrow fees, float, or other financial leverage for the entity. The wrongful acts alleged herein were of the kind such agents were employed to perform, occurred substantially within authorized time and space limits, and were actuated, at least in part, by a purpose to serve their principal. Under federal RICO principles, a corporate

"person" conducting the affairs of an enterprise through a pattern of racketeering may be held vicariously liable for predicate acts committed by agents acting within the scope of their authority and for the benefit of the corporation. Under Illinois agency law, respondeat superior likewise attaches where agents commit tortious acts in connection with duties assigned by the principal and in furtherance of the principal's business objectives. The entity Defendants here derived direct and indirect benefits from the racketeering activity, including retention of business relationships, leverage over transaction outcomes, and collection or preservation of fees and revenues flowing through the enterprise.

39A. For clarity, the enterprise is an ongoing escrow-control network operating through title companies, affiliated law firms, and buyer-side leverage entities. The common purpose is to unlawfully influence and direct the escrow, clearance, and disbursement phases of residential real estate transactions by: (a) retaining leverage through recorded clouds and "mutual consent" requirements; (b) fabricating or altering settlement statements; (c) conditioning clearance on the surrender of legal claims; and (d) concealing the true status of escrow funding. The enterprise's methods are capable of repetition in any transaction in which a title/escrow intermediary is engaged, and have been used in other transactions as reflected in 61–62. The predicate acts pled in 40–57 occurred within the scope of this enterprise. The same scheme poses risk to all Illinois sellers who rely on Chicago Title

39B. Specific role-to-act linkage (Reves conduct). — **McElhaney (CFCH)**: circulated/relied on forged packet: "We are closing per the contract on file" (July 14–15) (Ex. D, pp. 42–44; Ex. B). — **Lohrman (Castle Law)**: sent fabricated "extension" after lapse (July 14) and coercive emails

(July 15, 19) (Ex. C; Ex. B). — **Krause (Castle Law)**: July 17 mocking/pressure email: "No emojis? I am disappointed." (Ex. B). — **Holloway (Chicago Title)**: imposed "mutual consent," withheld escrow verification (Ex. G, pp. 64–66; Ex. B). — **Spreadbury (Chicago Title)**: "We have no funds to disburse." (July 17) (Ex. B). — **Wagner (Chicago Title)**: ultimatum conditioning clearance on **CFCH** release or subject-to closing (July 18) (Ex. G, pp. 64–66; Ex. B). — **Remke (Closer)**: presented pre-notarized packet; directed "sign under protest" (July 16) (Ex. H, pp. 68–69). — **Lopez (CFCH)**: maintained possession leverage (locks/utilities) to control the closing window (July 2025) (Ex. K).

## VI. PREDICATE ACTS (PLEADED WITH PARTICULARITY UNDER RULE 9(b))

Mail/Wire Fraud (**18 U.S.C. §§ 1341, 1343**)

40. July 14 — **McElhaney (cc: Lohrman)**: "That's not how this works since title is already set for tomorrow." Falsity: Invoked an expired, unfunded instrument. Purpose: Pressure Plaintiff to accept suppressed terms. Causation: Advanced the $45,000 loss. Statutes: § 1343; supports **§ 1951**. Exhibits: A–B, D.

41. July 14 — **McElhaney (cc: Lohrman)**: "We are closing per the contract on file." Falsity: No valid contract; no earnest money. Purpose: Block the $165,000 deal. Statute: **§ 1343**. Exhibits: A–B, I–J.

42. July 14 — **Lohrman**: Transmission of a fabricated "extension" after lapse. Falsity: No executed extension; instrument void. Purpose: Preserve **CFCH** leverage. Statutes: **§§ 1341, 1343**. Exhibit: C.

43. July 15 — **Lohrman**: "Your memo is junk... If you don't close, you will be in court... Quit wasting everyone's time." Falsity: Misstated duties; no valid **CFCH** contract existed. Purpose:

Coerce closing. Statutes: **§ 1343**; supports **§ 1951**. Exhibit: B.

44. July 15 — **McElhaney** (cc: **Lohrman**): "We are ready to close. Please sign and return." Falsity: No escrow funds; forged packet in play. Statute: **§ 1343**. Exhibits: D, B.

45. July 16 — **Mark-Hansen** (cc: **Spreadbury, Holloway**): Transmission of disputed closing documents. Falsity: Forged ALTA with inflated/false numbers. Statutes: **§§ 1341**, 1343. Ex: D.

46. July 16 — **Holloway**: Admitted no funds but enforced no clearance without **CFCH/McElhaney** release. Purpose: Grant **CFCH/McElhaney** a veto over title. Statute: **§ 1343**. Exhibits: B, G.

47. July 17 — **Holloway**: Imposed "mutual consent" for disbursement. Purpose: Formalize **CFCH** veto; obstruct lawful close. Statutes: **§ 1343**; supports **§ 1951**. Exhibits: G, B.

48. July 17 — **Chicago Title**: Tendered Mutual Release & NDA while maintaining cloud. Purpose: Insulate participants; obstruct reporting. Statutes: **§§ 1341**, 1343; supports **§ 1512(b)(3)**. Exhibit: G, pp. 64–66.

49. July 17 — **Spreadbury**: "We have no funds to disburse." Contradiction: Undermines "ready to close" claims. Statute: **§ 1343**. Exhibits: B, D.

50. July 17 — **Krause**: "No emojis? I am disappointed." Purpose: Ridicule/intimidation to induce compliance. Statutes: **§ 1343**; supports **§ 1951**. Exhibits: B, K.

51. July 18 — **Wagner**: Ultimatum: no clearance without **CFCH** release or subject-to closing on forged ALTA. Purpose: Force release despite void contract. Statutes: **§ 1343**; supports **§ 1951**. Exhibits: G, pp. 64–66; B.

52. July 19 — **Lohrman**: Retaliatory cease-and-desist. Purpose: Chill reporting; intimidate. Statutes: **§ 1343**; supports **§ 1951**; **§ 1512(b)(3)**. Exhibit: B.

53. July 17–19 — **Curran**. While serving simultaneously as a Castle partner and Illinois State

Senator, Curran received direct pre-filing notice with corroborating exhibits documenting forged ALTA instruments, extortionate "mutual consent" conditions, and unlawful escrow interference (Exs. B, G, K). Despite a clear duty under **Illinois Rules of Professional Conduct §§ 8.3–8.4** to take remedial action or report criminal conduct, he took no action, thereby violating both professional and public-trust obligations. This omission lent the scheme an appearance of legitimacy, emboldened its continuation, and materially furthered the racketeering agreement in violation of **18 U.S.C. § 1962(d)**. Crucially, Curran was named as a personal Releasee in the July 17 Mutual Release, tendered while the recorded Memorandum cloud and "mutual consent" veto were being used as coercive leverage (Ex. G, 64–67). From this, it is plausible to infer that he knew those wrongful means were being used to obtain his own release, and that he consented to and benefitted from them. As a partner, Curran possessed supervisory authority over Castle attorneys Lohrman and Krause, who executed the very acts identified in pp. 42–51. By failing to countermand the release demand or withdraw the "mutual consent" condition after notice, and by approving or causing his own inclusion as a Releasee, Curran ratified the scheme's continuation. These combined facts support a reasonable inference that he entered into an agreement to secure personal benefit via the enterprise's ongoing leverage, satisfying **§ 1962(d)**.

54. July 17–19 — **Davidson**: As Chief Executive Officer of **Castle Law**, received multiple, documented pre-filing notices detailing the use of forged ALTA/settlement documents, extortionate "mutual consent" conditions, and unlawful escrow interference (Exs. B, G). Despite having ultimate authority over corporate policy and personnel, and the ability to immediately halt these acts, Davidson knowingly allowed subordinates and agents to continue transmitting the forged packet and conditioning title clearance on a coerced release. By failing to intervene and instead permitting the enterprise to proceed, Davidson:

(a) Used and caused the use of wires in furtherance of a scheme to defraud, in violation of **18 U.S.C. § 1343;**

(b) Aided and abetted **Hobbs Act** extortion under **18 U.S.C. § 1951** by permitting wrongful threats to withhold clearance unless Plaintiff surrendered legal rights; and

(c) Obstructed justice under **18 U.S.C. § 1512(b)(3)** by failing to disclose material facts to law enforcement and regulatory bodies despite explicit notice.

His actions and omissions, taken in his capacity as CEO after direct and ample pre-filing notice, constituted knowing participation in, and ratification of, the **§ 1962(c)** pattern and a willful agreement under **§ 1962(d)**. Exhibit: K.

Both Curran and Davidson implicated themselves through admission of party opponent via mutual release after receiving notice of intent to litigate. This function does not absolve and further implicates them of enterprise liability and conspiracy claims and corroborates **Hobbs Act** extortion predicates.

55. July 16 — **Remke**: Presented pre-notarized packet; directed "sign under protest." Unlawful: Out-of-presence notarization; Illinois Notary Public Act violation; facilitated scheme. Statutes: **§§ 1341, 1343**. Exhibit: H, pp. 68–69.

56. July 15 — **Lopez (cc: McElhaney)**: Advanced prep as if **CFCH** were still valid buyer. Falsity: Concealed true buyer (**MBE**); no valid **CFCH** contract. Statutes: **§§ 1341, 1343**. Exhibit: B.

57. July 2025 — **Lopez**: Maintained unauthorized possession and control of 7238 S. King Drive by causing the locks to be changed, arranging utilities, and opening gas/electric accounts in his own name, after a cease-and-desist email notice (Ex. K). Purpose: Maintain leverage; coerce concessions. Statutes: **§§ 1341, 1343; § 1951**. Exhibits: Ex. K; utility records (to be produced)

**Hobbs Act** Extortion (18 U.S.C. § 1951)

58. Wrongful threat + obtaining property: CFCH recorded a Memorandum without any enforceable contractual right (no earnest money; unfunded escrow; expiration; lack of consideration) and, with Chicago Title/Castle, conditioned title clearance/disbursement on Plaintiff's concessions and a release, inducing fear of losing the $165,000 sale. EMLs in Ex. K and SMS messages show Lohrman, Krause, and McElhaney leveraging the cloud and "mutual consent" to extract concessions. (See Ex. E, p. 58; Ex. G, pp. 64–66; Ex. K.)

58A. Property obtained (clarification): The object of Defendants' extortion was obtaining (a) economic control over Plaintiff's sale proceeds; (b) dominion over title clearance via the recorded cloud; and (c) compelled surrender of monetizable legal claims through a release — each a form of obtainable value within **§1951**. (See Ex. E, p. 58; Ex. G, pp. 64–66; Ex. B.)

58B. On August 22, 2025, counsel for buyer-side witness Mr. Amon admitted in writing that Mr. Amon made a payment to Castle Law "to gain cooperation" of Castle and Chicago Title and "to avoid having the interim buyer coming after him." (See Ex. K.) These admissions confirm that Castle's cooperation was wrongfully withheld unless paid for, and that consent was induced by fear of economic retaliation. Such payments fall squarely within the definition of Hobbs Act extortion, **18 U.S.C. §1951**, and further corroborate the ongoing extortion pattern alleged herein.

59. Obstruction / Witness-Tampering **(18 U.S.C. § 1512(b)(3))** The Mutual Release was transmitted after Defendants were notified that Plaintiff was preparing to report the conduct to governmental authorities, and while the recorded cloud remained in place; it was designed to deter or shape those communications. (See Ex. G, pp. 64–66; Ex. K.)

59A. Nexus to official communications: Based on contemporaneous emails (Ex. K), it was foreseeable to Defendants that official proceedings or communications with federal law enforcement would ensue, and the release was intended to deter, influence, or prevent those communications while preserving leverage from the recorded cloud.

Notarial Misconduct as Scheme Component

60. Pre-notarized pages and out-of-presence notarization (**Remke**) violated Illinois notarial-presence requirements and facilitated the scheme. (See Ex. H, pp. 68–69.)

## VII. PATTERN AND CONTINUITY

61. Closed-ended continuity: Multiple related predicate acts (forgery, false statements, recorded cloud, release coercion, pre-notarization, physical dominion by **Lopez**). The pattern began no later than May 30, 2025, when the **CFCH** instrument was executed without earnest money or funded escrow. Subsequent acts—the fabricated extension, forged ALTA, recorded memorandum, and mutual-consent leverage—culminated in a $45,000 suppressed-equity loss on July 22, 2025. (See Exs. C–H, I–J, F, K.)

62. Open-ended continuity: The predicate acts alleged here mirror a recurring playbook used in the title and settlement industry—manipulated escrow flows, forged or falsified authority papers, and closing-table alterations—and thus present a continuing threat of repetition because they are embedded in the ordinary stream of closings and claim handling, not a single, terminated episode. See H.J. Inc., 492 U.S. at 241–42; Bible, 799 F.3d at 656–57 (threat shown where practice reflects a regular way of conducting business). Each entity Defendant is vicariously liable for the acts of its officers, employees, and agents undertaken within the scope of their

actual or apparent authority and at least in part to serve the entity's interests, including the accrual of premiums, escrow fees, and leverage over closing outcomes.

62A. Consistent fact patterns involving these same corporate families have surfaced across jurisdictions and years: (1) In California, employees of Defendant Chicago Title Insurance Company enabled a multi-year scheme using atypical "loop-de-loop" escrows and diverted proceeds among unrelated escrows—conduct embedded in routine escrow processing. Chicago Title Ins. Co. v. St. Paul Mercury Ins. Co., No. B221489, 2011 WL 6276097, at *1–4 (Cal. Ct. App. Dec. 16, 2011) (unpublished). (2) In Illinois, escrow misappropriation by an apparent issuing agent proceeded under Chicago Title/Ticor branding; the court allowed an apparent-authority vicarious-liability theory to proceed against the underwriter. Gondeck v. A Clear Title & Escrow Exch., LLC, 47 F. Supp. 3d 729 (N.D. Ill. 2014). (3) Courts in this District have examined claims alleging title-company participation in real-estate fraud schemes, while expressing skepticism of negligence theories absent specific knowledge; the court dismissed negligence but allowed repleading of aiding-and-abetting fraud. Amran Prop. Invs., LLC v. Fidelity Nat'l Title Grp., Inc., No. 20-cv-7464, 2021 WL 3855839, at *5–7 (N.D. Ill. Aug. 31, 2021). For land-trust authority issues, see MB Fin. Bank, N.A. v. Chicago Title Land Tr. Co., 2019 IL App (2d) 170659-U (Rule 23 order, nonprecedential). (4) Escrow-officer alterations and closing contrary to instructions can create foreseeable, post-closing harms; whether such damages are foreseeable is ordinarily a jury question. Tung v. Chicago Title Co., 63 Cal. App. 5th 734, 746–58 (2021). (5) Similar escrow-fund "lulling" appeared in litigation over 1031 exchanges against Fidelity National Title affiliates; the Third Circuit held a nine-and-a-half-month scheme was insufficient to show closed-ended continuity. Germinaro v. Fidelity Nat'l Title Ins. Co., 737 F. App'x 96, 103–04 (3d Cir. 2018). (6) Federal regulators have

likewise found systemic settlement-process deficiencies at Chicago Title, requiring nationwide remedial changes to RESPA/HUD-1 compliance. OCC Consent Order & CMP No. 2005-12 (Feb. 24, 2005); OCC NR 2005-21 (Feb. 28, 2005).


62B. These sources show that the same methods alleged here—forged authority paperwork, settlement-statement manipulation, escrow diversions, and coercive disbursement tactics—have recurred over years and locales and align with a multi-actor association-in-fact enterprise (title underwriter(s), retail agency/branch, escrow officers, outside finders/brokers, and cooperating notaries/closers). The enterprise shares a common purpose (closing transactions and extracting fees), relationships (repeat transactions, shared platforms and manuals, cross-referrals), and longevity (persistent, year-over-year use), satisfying Boyle v. United States, 556 U.S. 938, 946–47 (2009). The underwriter(s) set and enforced escrow/accounting manuals, branding, and access to HUD/ALTA preparation software; local agents and officers executed the disbursement and document steps; affiliated professionals procured victims and signatures; and profits (premiums, fees, float) flowed back through the underwriter's channels. These facts plausibly meet Reves v. Ernst & Young, 507 U.S. 170, 177–85 (1993) (operation/management test) and Boyle's structure requirement even absent formal hierarchy. (See ¶39A identifying manuals, wire templates, and HUD/ALTA preparation tools.) On information and belief, Defendants continue to employ the same escrow-control methods described in ¶39A in other residential transactions. The underwriter(s) acted through their authorized officers and agents, whose acts fell within the ordinary scope of escrow, clearance, and disbursement functions, and from which the underwriter(s) derived direct and indirect benefits.

## VIII. STANDING & INJURY

63. Standing, Capacity, and Injury. Plaintiff proceeds pro se in his individual capacity. Plaintiff is the Successor-Trustee of the Barbara J. Holmes Trust dated September 16, 1998. Consistent with representation rules, any claim that belongs to the Trust—including the $45,000 suppressed-equity delta—is pleaded for notice/limitations purposes but reserved for assertion by licensed counsel upon appearance; Plaintiff does not seek to recover Trust damages in his individual capacity and disclaims double recovery.

(a) Individual injury (present claim): Plaintiff suffered out-of-pocket consequential damages proximately caused by Defendants' conduct (e.g., title-curative work, duplicate closing preparation, professional fees, travel/time costs), presently estimated at $45,000.

(b) Trust injury (reserved): The suppressed-equity delta of $45,000 is pleaded as the Trust's injury and reserved for assertion by licensed counsel upon appearance; Plaintiff requests leave to align capacity/caption if and when counsel appears.

## IX. CLAIMS FOR RELIEF

### COUNT I — RICO (18 U.S.C. §1962(c))(Against All Defendants)

64-66. Plaintiff realleges 1–63; each Defendant is a "person" under **§1961(3)**; the association-in-fact enterprise is described in 37–39A with distinctness (66A–66B); Defendants conducted or participated in the enterprise's affairs through a pattern of racketeering (40–57; 58–59A), causing injury (63); Plaintiff is entitled to treble damages and fees under **§1964(c)**.

66A. Distinctness. Each Defendant ("person" under **§1961(3))** is legally distinct from the association-in-fact enterprise described in 37–39A, which exists separately from the Defendants and whose affairs the Defendants conducted through the racketeering pattern alleged herein.As set forth in 39, each entity Defendant is vicariously liable under federal and Illinois agency law for the racketeering acts of its authorized agents and employees committed within the scope of their duties and for the benefit of the entity.

66B. The escrow-control enterprise is defined in 39A, and its ongoing pattern is detailed in 62. Both paragraphs are incorporated to establish that the predicate acts alleged in 40–57 are part of a repeatable operational model by which the enterprise manipulates escrow, clearance, and disbursement across multiple transactions .The enterprise's conduct is not limited to Plaintiff's July 2025 transaction. Its methods replicate a pattern long present in Castle Law's leadership. Between 2014 and 2016, Gary K. Davidson, Castle CEO, was the subject of a public complaint by the Illinois Attorney Registration & Disciplinary Commission (ARDC) alleging the concealment of prohibited fees within HUD-1 settlement statements in connection with more than 200 Will County real estate transactions. Regulators characterized these hidden charges as "prohibited fees or kickbacks."

67-71. The mechanics in Davidson's prior matter mirror those employed against Plaintiff: concealment of charges within closing statements, manipulation of disbursements, and abuse of fiduciary responsibilities to siphon equity. In Plaintiff's case, Defendants concealed and attempted to  divert undisclosed charges of $43,695 to Cash For Chicago Houses  and $750 in undisclosed charges to Castle Legal  through forged and irregular ALTA/Master Statement packets, pre-notarized certificates, and clouding of title.

This history demonstrates that Castle Law's leadership has, for over a decade, engaged in systematic misuse of settlement documents and fiduciary positions to conceal and divert funds. The continuity between the 2014–2016 ARDC allegations and the present matter establishes that Defendants' misconduct is not isolated but constitutes a long-standing business practice posing a continuing threat to the public.

**COUNT II — RICO CONSPIRACY (18 U.S.C. §1962(d))** (Against All Defendants)

64–71 Plaintiff realleges 1–63 and 66A–66B

1–70. Defendants knowingly agreed to facilitate the enterprise's scheme, and overt acts in furtherance are pled at 40–60. Relief under **§1964(c)**.

71-74. As further detailed in 53, these facts demonstrate Curran's willful participation, he is not a peripheral figure but a partner in Castle Law and a sitting State Senator. As set forth in 53 and corroborated by Exhibits B, G, and K, he received direct notice with supporting documentation of forged ALTA instruments, extortionate "mutual consent" conditions, and unlawful escrow interference. Despite a clear duty under **Illinois Rules of Professional Conduct §§ 8.3–8.4** to act or report, Curran took no corrective action. Instead, he stood to benefit personally: he was explicitly named as a Releasee in the July 17 Mutual Release tendered while the Memorandum cloud and "mutual consent" veto were being used as leverage. Curran's unexplained inclusion, coupled with his silence after notice, supports the plausible inference that he knew and consented to the unlawful leverage being applied for his own release. As a partner, he had supervisory authority over Castle attorneys Lohrman and Krause, who executed core predicate acts. By failing to countermand their conduct and approving or causing his inclusion in

21

the Release, Curran ratified the scheme's continuation and agreed to secure personal benefit

through the enterprise's extortionate tactics. These combined facts establish his willful

participation in, and agreement to, the **§1962(d)** conspiracy.

**COUNT III — COMMON-LAW FRAUD** (Against All Defendants)

75–80. False statements/omissions include: forged ALTA (45, 30), "ready to close" vs. no funds

(44, 49), fabricated extension (42). Knowledge/intent, reliance, and injury as alleged (63).

**COUNT IV — TORTIOUS INTERFERENCE WITH CONTRACT / EXPECTANCY**

(Against **CFCH, McElhaney, Lopez, Castle Law/Lohrman/Krause,** and **Chicago Title**

**personnel**)

81–86. Expectancy to sell for $165,000 by July 18, 2025 (Ex. I; Ex. J). Defendants knew (29–34)

and interfered via the fabricated extension, forged ALTA, recorded memorandum, "mutual

consent," and the Mutual Release (29–33, 40–51, 58–59A). Injury (63).

**COUNT V — CONVERSION** (Against **CFCH, McElhaney, Lopez, Castle Law,** and

**Chicago Title** personnel)

87–93. Defendants McElhaney, Lopez, and others wrongfully exercised dominion over

Plaintiff's tangible personal property, including the property's keys and locks, without

authorization and after explicit written demand for their return. Defendant Lopez caused the

locks to be changed in mid-July 2025, excluding Plaintiff from full access and control of the

premises.This unauthorized possession continued despite Plaintiff's cease-and-desist notice (Ex. K), constituting conversion under Illinois law. (57, 90). Injury as alleged (63).

## COUNT VI — BREACH OF FIDUCIARY DUTY (Title/Escrow Defendants)

94–98. Title/escrow defendants owed neutrality, candor, and due care. Breaches include refusing escrow verification, circulating a forged ALTA, imposing "mutual consent," and tying clearance to a third-party Mutual Release while the **CFCH** instrument was unfunded/expired (29–33, 45–51, 58–60). Injury (63).

## COUNT VII — SLANDER OF TITLE (Against **CFCH, McElhaney, Lopez, Castle Law/Lohrman**)

99–103. Publication of a false disparagement by recording a Memorandum of Contract without lawful basis (Ex. E, p. 58). Malice/reckless disregard; special damages.

100A. Contract's memorandum clause & lapse. Exhibit A **§12.6** allows the buyer to record a memorandum; however, that authority presupposes a valid, funded contract. Exhibit A **§1.4** requires an earnest-money deposit ("Deposit"). No earnest money was deposited; escrow was never funded; and the instrument lapsed. (Ex. A, §§**1.4**, 12.6, pp. 22–24; Ex. B.)

100B. Falsity at time of publication. Because the **CFCH** instrument was unfunded/expired, the Memorandum recorded on July 15, 2025 asserted a present, enforceable interest that did not exist and therefore falsely disparaged title. (Ex. E, p. 58.)

100C. Malice/knowledge. Defendants had actual notice of the lapse/unfunded status (escrow

verification refusals; "We have no funds to disburse.") before and after recording and used the cloud as leverage to extract concessions, evidencing malice. (Ex. B; Ex. G, pp. 64–66.)

**COUNT VIII — ILLINOIS NOTARY PUBLIC ACT VIOLATIONS & NEGLIGENCE PER SE** (Against **Chicago Title/Castle Title** and notary personnel including **Robin Remke**)

104–108. Illinois notarial law requires personal appearance and prohibits notarization outside the signatory's presence. **Remke** presented pre-notarized pages and directed "sign under protest," violating statutory standards (55; Ex. H, pp. 68–69). Illinois common law imposes a duty of reasonable care on notaries and their employers to comply with applicable statutes, including the **Illinois Notary Public Act, 5 ILCS 312/6-102**. That Act requires personal appearance and prohibits notarization outside the signatory's presence. Defendant Robin Remke breached that duty by presenting pre-notarized pages and directing Plaintiff to "sign under protest" without witnessing the signature, in violation of 5 ILCS 312/6-102, thereby failing to exercise reasonable care. This breach facilitated the circulation of a forged ALTA packet and contributed directly to Plaintiff's injuries as described in 63. The photo on Ex. H, p. 69 shows Plaintiff's handwriting "Signed under protest" on the "Master Statement – Continued" page that includes "Buyer draws $171,970," corroborating that the packet was presented with irregular notarization and contested terms. (Ex. D, p. 43.)

**COUNT IX — ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2)** (Against All Defendants)

109–112. Deceptive/unfair practices in a commerce transaction include forged settlement statements, title-cloud leverage, "mutual consent" conditioning of disbursement, and coercive release demands (29–33, 40–51, 58–60). Public impact; commerce; damages. Plaintiff engaged in this transaction through a trust holding title to the property as trustee and beneficiary, satisfying business to business transaction standard. Defendants' conduct occurred in the context of the Illinois residential real estate marketplace and impacts the general public. The escrow-control scheme, use of forged settlement statements, and conditioning of clearance on releases are practices Defendants employ in multiple residential closings, thereby creating a risk of harm to Illinois consumers and the public at large. Such practices diminish transparency, suppress property values, and undermine confidence in the residential real estate market.

## COUNT X — COMMON-LAW CIVIL CONSPIRACY (Against All Defendants)

113–116. Agreement to accomplish unlawful objectives (fraud, slander of title, ICFA violations) through acts alleged (40–60). Overt acts include the fabricated extension, forged ALTA, recorded memorandum, "mutual consent," and release pressure (42–51, 58–59A). Damages (63).

## COUNT XI — QUIET TITLE / DECLARATORY RELIEF (Against CFCH, McElhaney, Lopez, Castle Law/Lohrman/Krause/Davidson, and Chicago Title personnel)

117A–D. Defendants recorded a Memorandum purporting to create rights in CFCH under a void, unenforceable instrument for lack of earnest money, unfunded escrow, lapse, and extortionate use (25–33, 58–58A). Plaintiff seeks a declaration and order quieting title and

directing the Cook County Recorder to expunge Document No. 2519622258 (recorded 7/15/2025).

## X. DAMAGES

118. Plaintiff calculates damages as follows:

(a). Suppressed-equity (Trust—reserved). The **$45,000** delta between the **$165,000** documented deal and the **$120,000** close is alleged as a Trust injury and is not sought by Plaintiff in his individual capacity; it is reserved for counsel upon appearance (See Ex. I; Ex. J; Ex. F, pp. 60–62.)

(b) Consequential damages — including title-curative work, duplicate closing preparation, and professional fees (Ex. E, p. 58; Ex. G, pp. 64–66), estimated at **$45,000**; foreseeable consequences of escrow abuse recognized in Illinois law.

(c) **$12,571** inflated charges — contained in the forged Master Statement but absent from the clean close (Ex. D, pp. 42–44; Ex. H, pp. 68–69; Ex. F, pp. 60–62). These are pled as predicate acts/pattern evidence, not as direct loss;

(d) **$50,330.89** buyer-side enrichment — composed of disbursements and commissions listed in the forged packet (Ex. D, pp. 42–44) but not in the clean close (Ex. F, pp. 60–62). Pled as pattern evidence of enterprise enrichment, reserved for joinder of the buyer or counterparties.

The aggregate of direct + consequential damages is **$90,000** trebled under **18 U.S.C. §1964(c)** to **$270,000**. Plaintiff further reserves punitive damages where applicable, as well as attorney's fees upon appearance of counsel. Given the deliberate fraud, forgery, coercion, and escrow abuse carried out as part of an ongoing racketeering enterprise, punitive

damages are warranted (in addition to trebled damages). Plaintiff seeks treble damages under **18 U.S.C. §1964(c)** on Counts I–II, plus punitive damages where authorized on state-law counts.

119. Accordingly, Plaintiff seeks treble damages under **18 U.S.C. §1964(c)**, plus punitive damages on state-law counts, fees and costs, and pre- and post-judgment interest, as already set forth.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants, jointly and severally, and award:

(A) compensatory damages of **$90,000**;

(B) treble damages under **18 U.S.C. §1964(c)**, for a total of **$270,000**;

(C) punitive damages on applicable state-law counts;

(D) costs and reasonable attorney's fees under **§1964(c)**;

(E) pre- and post-judgment interest;

(F) equitable relief, including:

(1) a declaration that the July 17, 2025 Mutual Release & Non-Disparagement Agreement is void and unenforceable;

(2) an injunction prohibiting enforcement of any contractual/recorded instruments arising from the expired CFCH instrument;

(3) order Defendants to execute and take all steps necessary to cause expungement.

Document No. 2519622258 (recorded 7/15/2025) and to remove any cloud on title caused

by Defendants' actions; and

(G) such other and further relief as the Court deems just and proper.

## XII. JURY DEMAND
120. Plaintiff demands a trial by jury on all issues so triable.


## XIII. VERIFICATION (28 U.S.C. §1746)

I declare under penalty of perjury that the foregoing is true and correct. Executed on: 8/25/2025

Respectfully submitted,
/s/ **David Mann**
Davidj099@icloud.com

470-232-5927 1255 S Michigan Ave, Apt 601 Chicago,IL 60605



## XIV. EXHIBIT LIST (WITH PAGE REFERENCES)

• Exhibit A — Purchase Agreement / Contract and Escrow Instructions (May 30, 2025) —

**CFCH** form naming **Chicago Title** as escrowee; earnest-money requirement; includes §§1.4

(Deposit) and 12.6 (Memorandum).

• Exhibit B — Expanded Chronological Timeline — prepared July 22, 2025 (clean/forensic).

• Exhibit C — **Castle Law** "Extension" Letter — sent post-lapse (July 14) to create false

continuity.

• Exhibit D — Forged "Master Statement" / ALTA & Associated Title/Escrow Documents —

includes image pages 42–44 showing "MASTER STATEMENT — Continued" and "Buyer

draws $171,970."

• Exhibit E — Recorded Memorandum of Contract Clouding Title — image at p. 58.

• Exhibit F — ALTA Settlement Statement (**Network Title**, July 22, 2025) — Buyer: **MBE Financial Group**, Inc.; Sale Price: $120,000; Net to Seller $98,379.11 — see pp. 60–62.

• Exhibit G — Mutual Release & Non-Disparagement Agreement — pp. 64–66.

• Exhibit H — Photographs of Pre-Notarized Pages & "Signed Under Protest" — pp. 68–69 (**Robin Remke**).

• Exhibit I — July 5, 2025 Addendum — confirms $165,000 purchase price and July 18, 2025 closing.

• Exhibit J — July 12, 2025 Final Supersession Memorandum — confirms $165,000 and tacit acceptance by conduct.

• Exhibit K — July 2025 Email Communications (Native .eml) — Selected .eml messages and attachments (July 14–19, 2025) evidencing extortionate conduct by **Lohrman, Krause**, and **McElhaney,** (Lodged on a labeled USB to preserve headers/metadata.)

## APPENDIX A — ELEMENT CHART (For the Court's Convenience)

RICO **§1962(c)**: Person (65); Enterprise (37–39A); Distinctness (66A–66B); Conduct/participation (39B, 40–57); Pattern (Mail/Wire: 40–57; **Hobbs**: 58–58A; Obstruction: 59–59A); Injury & causation (63; Ex. F, 60–62; Ex. I–J).

Slander of Title: Publication of false disparagement (Ex. E, p. 58); Falsity via lapse/unfunded status and lack of authority (Ex. A **§§1.4, 12.6**; 25–33, 100A–100B); Malice (32–33; Ex. G, 64–66); Special damages (63, 118–118B).

Illinois Notary Act / Negligence Per Se: Duty — personal appearance/no pre-notarization (105); Breach — Ex. H, p. 68 (pre-completed notary block); Causation/harms — 55, 60; corroboration — Ex. H, 69 ("Signed under protest") and Ex. D, 43.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

### EXHIBIT A
Purchase Agreement / Contract and Escrow Instructions (May 30, 2025)

Docusign Envelope ID: A42314B3-CC67-4D9A-94D5-919C98AD7319

### PURCHASE AGREEMENT/CONTRACT AND ESCROW INSTRUCTIONS

**THIS PURCHASE CONTRACT AND ESCROW INSTRUCTIONS** ("Contract"), is effective as of the latest date it is executed by the Parties (the "Effective Date"), and comprises the entire contract and agreement between Seller (defined in <u>Section 1.9</u> below) and Buyer (defined in <u>Section 1.9</u> below) (collectively "Parties").

1. **BASIC TERMS.** This <u>Section 1</u> defines the Basic Terms of this Contract.

1.1 Property Address: **7238 S King Dr, Chicago, IL 60619, USA**

APN: **20-27-111-028-0000**

1.2 Legal Description: As stated in the Commitment to be provided by Escrow Agent.

1.3 The Property: The real property described in <u>Sections 1.1 and 1.2</u> together with all improvements, fixtures, and appurtenances thereon incidental thereto, plus the personal property described in <u>Section 1.12</u>.

1.4 Earnest Money: $ **500** (The "Deposit")

1.5 Purchase Price: $ **120,000**

1.6 Close of Escrow: Seller and Buyer will set closing to be as soon as practical, but no later than **31 Business Days** after Buyer's representative has provided Buyer current, approved pictures of the property.

1.7 Escrow Agent: Name: **Chicago Title**

Address: **10 S La Salle St Suite** 2750, Chicago, IL 60603, USA

1.9 Parties: Seller: **David Mann as Trustee**

Buyer: <u>Cash For Chicago Houses</u>

**1.10 INSPECTION PERIOD**
The Buyer's **21** inspection period will begin once Buyer's representative has provided Buyer current, approved pictures of the property. Buyer, in Buyer's sole and absolute discretion, may through written notice to Seller, cancel this Contract during the Inspection Period and obtain a return of the Earnest Money Deposit. Buyer wants to make sure that the house is in the condition the seller explained.

**1.11 CLOSING COSTS.**

All standard closing costs, title fees, transfer taxes and other title costs are to be **paid in full by Buyer.**

**HOA fees (disclosure, transfer, capital improvement/reserve) (if applicable):**
☐ 50% by Buyer and 50% by Seller or ☐100% by Buyer.

1.12 **ADDITIONAL TERMS AND CONDITIONS.**

**Property to be delivered** vacant, with some personal belongings left behind.

**2.** **PURCHASE AND SALE OF PROPERTY.** For the Purchase Price and in accordance with the terms and conditions set forth in this Contract, Seller agrees to sell, and Buyer agrees to buy the Property identified in Section 1.3. The Deposit shall be credited toward the Purchase Price at COE.

**3.** **STATUS OF TITLE.** As soon as practical following the Effective Date, The Buyer through their designated Escrow Agent shall order and cause a current title commitment for an ALTA Owner's Policy of Title Insurance (the "Commitment") to be issued and delivered to Seller and Buyer. Buyer and Seller shall satisfy their respective requirements to Commitment prior to COE. Seller shall remove all liens, clouds, utility bills and encumbrances at or prior to COE. If title is not clear on the COE date or if there are issues with title that do not allow it to be insurable (such as probate, tax liens, payoff statements delays, or other title delays) then Buyer and Seller agree to extend the date of COE for up to 30 calendar days to obtain clear title. During this time this contract may be terminated by option of Buyer whereas all earnest monies to be refunded to buyer.

**4.** **INSPECTION OF AND ACCESS TO THE PROPERTY.** Buyer, in Buyer's sole and absolute discretion, may through written notice to Seller, cancel this Contract during the Inspection Period set forth in Section 1.10 and obtain a return of the Earnest Money Deposit and any other items or things of value given by Buyer to Seller. From the Effective Date through COE, Seller shall provide access to the Property to Buyer, and will make the Property reasonably available to Buyer and to Buyer's assignees, prospective assignees, agents, representatives, inspectors and authorized individuals to conduct inspections and walkthrough(s) of the Property. *If occupied the buyer will give seller 48hr notice to access the property, if property is unoccupied the seller will allow buyer to place lockbox on property for easy access.*

**5.** **INSTRUCTION TO RELEASE THE DEPOSIT UPON CANCELLATION DURING THE INSPECTION PERIOD.** Seller hereby irrevocably instructs Escrow Agent to return the Deposit to Buyer, or to any person or entity designated by Buyer to receive the Deposit, if Buyer elects to cancel this Contract during the Inspection Period and no further written instructions are required for Escrow Agent to release the Deposit to Buyer or to any person or entity designated by Buyer to receive the Deposit. Seller hereby waives any rights under state or other law to object to the release of the Deposit if this Contract is canceled by Buyer during the Inspection Period and waives any right to provide any additional written consent to the release of the Deposit if this Contract is canceled by the Buyer during the Inspection Period.

**6.** **OCCUPANCY OF PREMISE.** Seller represents and warrants there are parties in occupancy of the Property, Buyer will be given occupancy of the Property at Closing unless otherwise specified herein:      Vacant

**7.** **AS IS PURCHASE; EXISTING CONDITION AS OF COE.** Buyer is purchasing the Property "AS IS" and in the condition existing as of the Effective Date. The Property shall be delivered to Buyer at COE in substantially the same condition existing as of the Effective Date. In the event of loss of or damage to the Property, or a portion thereof, prior to the Closing, Buyer may terminate this Contract and the Deposit, and any other items or things of value given by Buyer to Seller will be refunded to Buyer.

**8.** **ESCROW; COE; CLOSING COSTS AND PRORATIONS.** Seller and Buyer engage Escrow Agent to act as the escrow agent for the closing of the transactions contemplated by this Contract. Title will be transferred by general warranty deed. Buyer and Seller shall execute all documents and perform all other acts Escrow Agent reasonably requires to close escrow on or before the COE date set forth in Section 1.6. All real estate taxes, rents, and assessments shall be prorated as of COE. <u>TAX PRORATION</u> Seller shall pay all real estate taxes encumbering the Property for the years prior to the year of CLOSE. Taxes for the year of CLOSE, shall be prorated without the inclusion of any of Seller's current real estate tax exemptions and shall be prorated to Buyer based upon the non-exempt tax bill. In the event the year of closing is a re-assessment year for the township located within the county the real estate taxes shall have any percentage increase in the real estate tax assessment for the property added to the proration to Buyer from Seller, There shall be no real estate tax escrow or reproration of the real estate taxes post closing. The Parties shall pay the specific closing costs applicable to them as set forth in Section 1.11.

**9.** **CURE NOTICE; REMEDIES; ATTORNEYS' FEES.** If a party fails to comply or perform under this Contract, the other party shall deliver a notice to the breaching party specifying the non-compliance (the "Cure Notice"). If the non-compliance is not cured within ten (10) calendar days after receipt of the Cure Notice (the "Cure Period"), the failure to comply shall become a breach of this Contract. A Cure Notice is not required upon Seller indicating an intention to or refusing to close escrow by the COE date. If Seller shall breach any of the terms or provisions of this Contract, Buyer may proceed against Seller for any claim or remedy the Buyer may have in law or equity, which includes, but is not limited to, specific performance and damages as well as recording this agreement or a memorandum of this agreement upon Seller's title and this act shall not be deemed a clouding of Seller's title. If Buyer breaches this Contract, Seller accepts the Deposit as Seller's sole right to damages and shall be considered Seller's liquidated damages and Seller shall have no further rights or remedies against the Buyer in equity or law. Should the Buyer prevail in any lawsuit arising out of or to enforce this Contract shall be awarded its reasonable attorneys' fees, expert fees and costs incurred prior to and/or after the filing of such lawsuit. Any attorneys' fees awarded in favor of Buyer may be paid to Buyer from the proceeds of the closing of the transaction contemplated by this Contract.

Docusign Envelope ID: A42314B3-CC67-4D9A-94D5-919C98AD7319

**10.     NO ORAL CHANGES OR REPRESENTATIONS.**  EACH PARTY ACKNOWLEDGES THAT SUCH PARTY HAS NOT RELIED ON ANY ORAL CONTRACT, STATEMENT, REPRESENTATION OR OTHER PROMISE THAT IS NOT EXPRESSED IN WRITING IN THIS CONTRACT.  This Contract may be amended or modified only by an agreement in writing signed by Buyer and Seller.

**11.     NOTICES.**  Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery, electronic mail, or upon receipt, if deposited in the U.S. Mail, registered or certified, return receipt requested, postage prepaid, or if deposited with any commercial air courier or express service.

**12.     MISCELLANEOUS.**

    12.1     *Addendum, Acknowledgements, and Additional Terms and Conditions.*  The Parties agree to be bound by the additional terms and conditions specified in Section 1.12 and if such additional terms and conditions conflict with any other provision of this Contract, the terms and conditions set forth in Section 1.12 shall control.

    12.2     *Assignment.*  Buyer may assign this Contract or any of its rights hereunder to any person, partnership, corporation or other entity without Seller's approval or notice to Seller.

    12.3     *Buyer's Marketing of its Contract Interest.*  Buyer has the right to market its contract interest in the Property in Buyer's sole discretion, which may include, but is not limited to listing the Property and Buyer's contract interest in the Property on any Multiple Listing Service ("MLS").  Seller, hereby appoints Buyer as its attorney in fact with the full power and authority to act in the name and place of Seller for the execution of any and all documents necessary to list the Property and Buyer's contract interest in the Property on the MLS.

    12.4     *Time is of the Essence.*  Time is of the essence with respect to the performance of all terms, conditions and provisions of this Contract.

    12.5     *Choice of Law.*  This Contract shall be governed and enforced under the laws of the state where the Property is located without regard to any conflict of law provisions.

    12.6     *Memorandum of Contract.*  In addition to the terms of Paragraph 9 herein Seller agrees that Buyer may execute, acknowledge, and record a memorandum or affidavit of this Contract in the official records of the recorder of the county in which the Property is located.  Seller's signature on any affidavit or memorandum is not required for the recording of the same.

    12.7     *Electronic Execution and Counterparts.*  This Contract may be executed by electronic means and in any number of counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument.

    12.8     *Buyer Disclosures and Voluntary Agreement.*  Seller understands and acknowledges that Buyer is a Wholesale Buyer, which means Buyer is an investor who, in its discretion, may assign its contractual interest in the Property for a profit.  The Purchase Price may not reflect the Property's fair market value.

    12.9     *Notice of No Agency Relationship:*  This notice of no agency is being provided as required by state law. Buyer is a licensed Real Estate Broker (License # 475187703). Buyer is not representing any parties in this transaction.

**[SIGNATURES ON THE FOLLOWING PAGE]**

**Seller acknowledges and agrees that Seller has read and fully understands the terms and conditions of this Contract and is entering into this Contract voluntarily and has not been threatened, coerced, or intimidated into signing this Contract.**

APPROVED AND ACCEPTED BY SELLER:

Date: _____ 5/30/2025 _____

SELLER: _____
847253680610401

_____

_____

SELLER'S CONTACT INFORMATION:

Address:  7238 S King Dr, Chicago, IL 60619, USA

Phone/Email:  4702325917/davidj099@icloud.com

APPROVED AND ACCEPTED BY BUYER:

Date: _____

BUYER:
Brendan McElhaney: _Brendan McElhaney_
                    3EDE3F519DFC429
Abel Lopez: _____
                    C12A9E50587243D

COMPANY: CASH FOR CHICAGO HOUSES

BUYER'S CONTACT INFORMATION:

Address: 3975 W Barry, Chicago IL, 60618

Phone/Email: 312-498-4821/  brendan@cashforchicagohouses.com

33

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT B**
Expanded Chronological Timeline â€" prepared July 22, 2025 (clean/forensic)

**EXHIBIT B**

**Expanded Chronological Timeline – Contract Interference, Escrow Misrepresentation, and Closing Events**

**May 30, 2025 – Initial Purchase Agreement**

- Brendan McElhaney, via Cash For Chicago Houses, LLC (CFCH), executes a purchase agreement for 7238 S. King Dr., Chicago, IL at $120,000, naming Chicago Title as escrowee.
- Buyer obligated to deposit earnest money; contract includes an assignment clause.

**July 5, 2025 – Price Increase Addendum**

- Written Addendum sets purchase price at $165,000 with a July 18, 2025 closing deadline.

**July 8, 2025 – Escrow Verification Requests Begin**

- Plaintiff requests from Chicago Title (Nicole Holloway, Therese Mark-Hansen) and Castle Law (William Lohrman, Brian Krause): (i) proof of earnest-money deposit; (ii) escrow verification; (iii) contract execution timeline.
- No documentary confirmation provided despite contractual requirements.

**July 10, 2025 – Continued Refusal to Confirm Escrow**

- Chicago Title and Castle Law continue to withhold escrow confirmation; Plaintiff issues follow-ups.

**July 12, 2025 – Final Supersession Addendum Issued**

- Plaintiff issues final addendum anchoring sales price at $165,000 if close extends beyond July 14. (Ex. J)
- Defendants do not transmit settlement instructions; responses reference pending compliance.

**July 13, 2025 – No Response After Closing Readiness**

- No communications from Castle Law, Chicago Title, McElhaney, despite Plaintiff's readiness to close.
- Plaintiff follows up with Holloway, Mark-Hansen, and Lohrman seeking wire release/disbursement confirmation.

**July 14, 2025 – Post-Lapse Extension Letter**

- Castle Law issues an extension letter on firm letterhead (signed by William Lohrman and transmitted via email).
- Letter maintains appearance that McElhaney/CFCH remains the buyer; does not disclose MBE as end-buyer; extends purported contract through July 15. Plaintiff rejected extension the same day on record. (Ex. K)

**July 15, 2025 – Remote Closing Window; Forged ALTA Circulated**

- Plaintiff available remotely; Castle attorneys send multiple emails referencing a forged/altered ALTA Master Settlement Statement and demanding immediate action. (Ex. D, pp. 42–44)
- Brendan McElhaney submits an unsigned ALTA with inaccurate disbursements. (Ex. D, pp. 42–44)

- Plaintiff requests from Chicago Title: (i) whether the buyer is present; (ii) whether the settlement statement is authorized; (iii) confirmation that disbursement instructions will be honored. No response.
- Memorandum of Contract was recorded by CFCH on July 15, 2025 to cloud title (Recorder Doc No. 2519622258). (Ex. E, p. 58)

## July 16, 2025 – In-Person Signing Under Protest; Pre-Notarized Pages

- Plaintiff appears at Chicago Title's downtown office.
- Closer: Robin Remke presents a pre-notarized ALTA packet matching the disputed version; notary block is completed before Plaintiff's signature; Remke instructs "sign under protest". (Ex. H, pp. 68–69)
- Plaintiff signs under protest and submits wire disbursement instructions as requested. (Ex. H, pp. 68–69)
- Inquiries to Holloway confirm no escrowed funds exist for CFCH; CFCH is not the funded buyer. (Ex. B)

## July 17, 2025 – Disbursement Reversal; Mutual Consent; Release Tendered

- Holloway states disbursement now requires mutual consent, reversing prior assurances. (Ex. G, pp. 64–66; Ex. B)
- Jay Spreadbury states: "We have no funds to disburse." (Ex. B)
- Mutual Release & Non-Disparagement is tendered while the recorded cloud remains, conditioning clearance on release execution. (Ex. G, pp. 64–66)
- Brian Krause sends a mocking email: "No emojis? I am disappointed." (Ex. B)
- Plaintiff initiates direct contact with MBE to salvage the transaction.

**July 18, 2025 – Chicago Title Ultimatum (Wagner)**

- Richard Wagner (RVP/Chief Legal Counsel, Chicago Title) issues an ultimatum: (i) obtain a signed cancellation from the first buyer (CFCH); or (ii) have the new buyer close subject to the first contract in the title policy. (Ex. G, pp. 64–66; Ex. B)
- Wagner adds: "Even accepting all of the information you provided as the only facts, our Company is not in the business of taking on the potential outcome of litigation." (Ex. G, pp. 64–66; Ex. B)

**July 19, 2025 – Retaliatory Cease-and-Desist**

- William Lohrman (Castle Law) sends a cease-and-desist email accusing Plaintiff of harassment and extortion and threatening to contact authorities; no merits response is provided. (Ex. K)

**Mid-July 2025 – Possession/Utility Control (Lopez)**

- Abel Lopez changes locks and opens gas/electric utility accounts in his own name after notice, maintaining leverage over the property. (Ex. K)

**July 19 – August 20, 2025 – Continuous Coordinated Silence After Notice**

- Despite pre-filing notice with exhibits, Gary Davidson (CEO, Castle Law) and John Curran (Castle partner/state senator) take no remedial steps to halt forged-packet use, withdraw mutual consent, disclose unfunded escrow, or correct misrepresentations.
- Chicago Title's senior management/legal do not issue statements, initiate investigation, or provide clarification.

- No ethics or regulatory reporting is initiated by the noticed actors before the amended filing.

**July 22, 2025 – Closing at Network Title (MBE)**

- Transaction closes at Network Title with MBE Financial Group as buyer at $120,000; Net to Seller: $98,379.11.

**July 25, 2025 – Original Verified Complaint Filed**

- Plaintiff files the original verified complaint in the N.D. Ill.

**August 20, 2025 – Verified Complaint Re- Filed**

- Plaintiff files a new verified complaint reflecting the continuous non-response from July 19 – August 20 and predicate-act particulars.

**Key Document/Statement References (for cross-checking within the record)**

- Forged ALTA / Buyer draws $171,970 (image pages show Master Statement — Continued). (Ex. D, pp. 42–44).
- Memorandum of Contract recorded 7/15/2025 (Doc No. 2519622258). (Ex. E, p. 58).
- Spreadbury: "We have no funds to disburse." (Ex. B)
- Mutual Release & Non-Disparagement transmitted 7/17/2025 while cloud remained. (Ex. G, pp. 64–66)
- Wagner (7/18): two-option ultimatum; litigation-risk disclaimer. (Ex. G, pp. 64–66; Ex. B).
- Lohrman (7/19): cease-and-desist/authorities email. (Ex. B).

- Remke: pre-notarized pages; "sign under protest". (Ex. H, pp. 68–69).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**Case No. _____**

**David Mann, Plaintiff,**

v.

Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

### EXHIBIT C
Castle Law â€œExtensionâ€ Letter â€" sent post-lapse (July 14) to create false continuity



Castle Law
2 N. 129th Infantry Drive, #100
Joliet, IL 60435
Phone 815-744-6550
Fax 815-744-4518

July 20, 2025

Via Email
David Mann

**RE: Mann sale to Cash For Chicago Houses
7238 S King Dr. Chicago IL 60619**

Dear David,

Please consider this letter our formal request for an extension of the closing date through Tuesday July 15th, 2025.

This is not a counteroffer, but merely a request for modification to the contract. If this is not acceptable, Buyer reserves the right to withdraw this request and ask that you advise me so immediately.

If this is acceptable please sign below, otherwise please contact us at your earliest convenience to discuss.

Sincerely,

Castle Law

William Lohrman

Cc: client, agent

42

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT D**

Forged â€œMaster Statementâ€ / ALTA and Associated Title/Escrow Documents â€" includes image pages 42â€"44 showing â€œMASTER STATEMENT â€" Continuedâ€ and â€œBuyer draws $171,970.â€

43

# Chicago Title and Trust Company

15255 South 94th Avenue, #604, Orland Park, IL 60462
Phone: (708)226-0700 | Fax: (708)226-5261

## MASTER STATEMENT

**Settlement Date:** July 15, 2025
**Disbursement Date:** July 15, 2025

**Escrow Number:** 25GSD284038WJ
**Escrow Officer:** Therese Mark-Hansen
**Email:** Therese.Mark-Hansen@ctt.com

**Buyer:** MBE Financial Group Inc.
7238 S King Dr
Chicago, IL 60619

**Seller:** David Mann, as Successor-Trustee of the Barbara J. Holmes Trust u/a/d September 16, 1998
7238 S King Dr
Chicago, IL 60619

**Property:** 7238 S King Dr
Chicago, IL 60619
Parcel ID(s): 20-27-111-028-0000

| SELLER | | | | BUYER | | |
|---|---|---|---|---|---|---|
| $ DEBITS | $ CREDITS | | | $ DEBITS | $ CREDITS | |
| | | **FINANCIAL CONSIDERATION** | | | | |
| | 120,000.00 | Sale Price of Property | | 120,000.00 | | |
| | | **PRORATIONS/ADJUSTMENTS** | | | | |
| 2,043.04 | | County Taxes 01/01/25 to 07/16/25 | | | 2,043.04 | |
| 1,649.33 | | County Taxes 07/01/24 to 12/31/24 | | | 1,649.33 | |
| | | **TITLE & ESCROW CHARGES** | | | | |
| | | Title - Commitment Update Fee to Castle Title Services, Inc. | | 175.00 | | |
| | | Title - CPL Fee to Buyer to Chicago Title Insurance Company | | 25.00 | | |
| | | Title - CPL Fee to Seller to Chicago Title Insurance Company | | 50.00 | | |
| 200.00 | | Title - Delinquent Tax Processing Fee to Chicago Title Company, LLC | | | | |
| | | Title - E Recording and Service Fees to Chicago Title Company, LLC | | 25.00 | | |
| | | Title - Escrow Fees to Chicago Title and Trust Company | | 1,850.00 | | |
| | | Title - Policy Update Fee to Castle Title Services, Inc. | | 175.00 | | |
| | | Title - State of Illinois Policy Registration Fee to Chicago Title Company, LLC | | 3.00 | | |
| 50.00 | | Title - Tax Payment Service Fee to Chicago Title Company, LLC | | | | |
| 200.00 | | Title - Title Indemnity Fee to Chicago Title and Trust Company | | | | |
| | | Title - Wire Transfer Service Fee to Chicago Title and Trust Company | | 50.00 | | |
| 2,500.00 | | TI for Sold Taxes to CTC-Transfer | | | | |
| | | Title - Owner's Title Insurance to Castle Title Services, Inc. / Chicago Title Company, LLC | | 2,150.00 | | |
| | | SE 32-06 - Homeowner's Inflation Protection | | 175.00 | | |

44

**MASTER STATEMENT - Continued**

| SELLER | | BUYER | | | |
| $ DEBITS | $ CREDITS | | $ DEBITS | $ CREDITS | |
|---|---|---|---|---|---|
| | | **TITLE & ESCROW CHARGES** | | | |
| | | (Residential) to Castle Title Services, Inc. | | | |
| | | Policies to be issued: Owners Policy Coverage: $120,000.00  Premium: $2,150.00 Version: ALTA Owner's Policy 2021 | | | |
| | | **GOVERNMENT CHARGES** | | | |
| | | Recording Fees to Cook County Recorder | 107.00 | | |
| 0.00 | | City Transfer Tax to MYDEC Chicago Transfer Stamps | 1,260.00 | | |
| 0.00 | | County Transfer Tax ($60.00) to MYDEC Cook County Transfer Stamps | 60.00 | | |
| 0.00 | | State Transfer Tax to MYDEC Cook County Transfer Stamps | 120.00 | | |
| | | **MISCELLANEOUS CHARGES** | | | |
| 2,171.01 | | 1st Inst 2024 County Taxes to ACH Cook County Taxes 20-27-111-028-0000 | | | |
| 4,222.83 | | 2023 County Taxes to ACH Cook County Taxes 20-27-111-028-0000 | | | |
| | | CLAS Fee for EOR to CLAS Clerking | 55.00 | | |
| 5,347.90 | | CLAS Water Cert to CLAS Clerking | | | |
| | | Commission - Selling to Keller Williams Preferred Realty | 500.00 | | |
| 14.50 | | Duplicate Tax Bill Fee + $.50 Service Fee to ACH Cook County Taxes | | | |
| 4,518.14 | | EOR for Sold Taxes to Cook County Clerk | | | |
| 11,375.41 | | Lien Payoff to Illinois Dept of Revenue | | | |
| | | Payment as Directed to Chicago Houses LLC | 43,695.00 | | |
| | | Seller Attorney Fee to Castle Legal | 750.00 | | |
| | | Survey to Urchell and Associates, Inc | 575.00 | | |
| | | Zoning to CLAS Clerking | 170.00 | | |
| 34,292.16 | 120,000.00 | **Subtotals** | 171,970.00 | 3,692.37 | |
| | | **Balance Due FROM Buyer** | | 168,277.63 | |
| 85,707.84 | | **Balance Due TO Seller** | | | |
| 120,000.00 | 120,000.00 | **TOTALS** | 171,970.00 | 171,970.00 | |

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

SELLER:

David Mann, as Successor-Trustee of the Barbara J. Holmes Trust u/a/d September 16, 1998

BY:_____

BUYER:

MBE Financial Group Inc.

BY:_____

To the best of my knowledge, the Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____

Chicago Title and Trust Company
Settlement Agent

 **CHICAGO TITLE COMPANY**

**TRUST INDEMNITY AND SECURITY AGREEMENT WITH DEPOSIT OF FUNDS TO PROTECT AND SECURE AGAINST EXCEPTIONS TO TITLE**

**Trust, Indemnity, and Security Agreement No.: 25GSD284038OPT**

WHEREAS, the Chicago Title Insurance Company hereinafter referred to as "Company", is about to issue its title insurance policy or policies or commitments therefore, all hereinafter referred to as the "Title Insurance Policy", No. 25GSD284038WJ, in respect to the land described therein.

AND WHEREAS, the Company has raised as title exceptions on the Title Insurance Policy certain defects, liens, encumbrances, adverse claims or other matters, all hereinafter referred to as "Exceptions to Title", described on Exhibit "A" attached hereto,

AND WHEREAS, the Company has been requested to issue the Title Insurance Policy and may hereafter, in the ordinary course of its business, issue title insurance policy or policies or commitments therefore in the form or forms now or then commonly used by the company, or issue hold harmless or indemnity letters to induce other title insurance companies to issue title insurance policies or commitments therefore, in respect to the land or to some part or parts thereof, or interest therein, all of the foregoing being hereafter referred to as "Future Policies or Commitments", either free and clear of all mention of the aforesaid Exceptions to Title or insuring its insured against loss or damage by reason thereof, and simultaneous with the acceptance of the deposit herein, has issued or has committed to issue the Title Insurance Policy to its insured.

NOW, THEREFORE, in consideration of the issuance of the Title Insurance Policy and the payment of One Dollar And No/00 Dollars ($1.00) to the undersigned by the Company, the sufficiency and receipt of which are hereby acknowledged, the undersigned, jointly and severally, for themselves, heirs, personal representatives, and assigns do hereby covenant and agree with the Company: (1) to forever fully protect, defend, and save the Company harmless from and against all the Exceptions to Title, in and from any and all loss, costs, damages, attorneys' fees, and expenses of every kind and nature which it, the Company, may suffer, expend or incur under, or by reason, or in consequence of the issuance of the Title Insurance Policy on account, or in consequence, or growing out of the Exceptions to Title, or on account of the assertion or enforcement or attempted assertion or enforcement thereof or of any rights existing or hereafter arising, or which may at any time be claimed to exist under, or by reason, or in consequence, or growing out of the Exceptions to Title or any of them; (2) to provide for the defense, at the undersigned's own expense, on behalf and for the protection of the Company and the parties insured or who may become insured under "Future Policies or Commitments", against loss or damage under the Title Insurance Policy (but without prejudice to the right of the Company to defend if it so elects) in all litigation consisting of actions or proceedings based on any Exceptions to Title which may be asserted or attempted to be asserted, established or enforced in, to, upon, against or in respect to the land or any part thereof or interest therein; (3) to pay, discharge, satisfy or remove all of the Exceptions to Title and, in such case, when the Exceptions to Title appear as a matter of public record, to clear the record by the recording or filing of releases, satisfactions, disclaimers, deeds or other appropriate instruments, or by the procurement of a final court order or judgment entered by a court of competent jurisdiction quieting the title of the insured, or declaring the Exceptions to Title to be null and void and of no force and effect, on or before July 15, 2026; and (4) that each and every provision herein shall extend and be in force concerning Future Policies or Commitments. It is expressly understood that the joint and several liability of the undersigned shall in no way be affected by any action the Company may take with respect to the liability of any one of the undersigned by way of release, settlement, compromise, or other adjustment of such liability.

The undersigned hereby deposits with the Chicago Title and Trust Company (hereinafter referred to as the "Trustee"), under the Agreement known as Trust, Indemnity and Security Agreement No. 25GSD284038OPT, and pledges to the Company the sum of Two Thousand Five Hundred And No/100 Dollars ($2,500.00) to constitute a trust, indemnity and security fund under the absolute control and possession of the Trustee as herein provided, for the other purposes herein set forth, and to secure the performance of the promises and obligations of the undersigned contained herein.

TI Agreement
ILD0039.doc / Updated: 06.03.24      Page 1      Printed: 07.15.25 @ 08:08 AM by
IL-CT-FSWA-01080.225410-25GSD284038WJ

47

## TRUST INDEMNITY AND SECURITY AGREEMENT WITH
## DEPOSIT OF FUNDS TO PROTECT AND SECURE
## AGAINST EXCEPTIONS TO TITLE
### (continued)

The Company shall have the right at any time hereafter, when it shall deem it necessary, expedient, desirable, or to its interest so to do, in its sole discretion, to direct the Trustee to use or apply the fund, or any portion thereof, in such manner and in such amounts as the Company may deem necessary and advisable, to the payment, discharge, or satisfaction of, or the removal from the title to the land, or any part or parts thereof, or interests therein, any of the Exceptions to Title, including the right to procure for the purpose of clearing the public record, releases, satisfactions, disclaimers, deeds or other appropriate instruments, or by procuring final court orders or judgments quieting the title of the insured or declaring the Exceptions to Title to be null and void and of no force and effect, or for the purpose of eliminating by conveyance, assignment or otherwise any Exceptions to Title, or for the purpose of reimbursing anyone who may have paid, discharged, satisfied, or removed any Exceptions to Title or cleared the public record of such Exceptions to Title.

In the case of litigation involving the said fund or the rights of any person or corporation hereunder, the cost, expense, and attorneys' fees of the Trustee and the Company may be paid or retained by the Trustee out of said fund.

If the Company shall find that the liability hereunder shall have increased because of lapse of time or otherwise, the Company may direct the Trustee to call on the undersigned for such additional deposits sufficient to indemnify and secure the Company against such increase of liability, in which event the Trustee shall call for such deposit, and the undersigned hereby agrees to thereupon furnish the Trustee the deposit requested. Any additional funds so deposited shall be subject to the terms of this Agreement to the same extent as though initially deposited hereunder. In the event additional funds are not deposited within ten (10) days following written demand therefore, the Company shall have the right, in its sole discretion, to advance such additional funds as may be required to the Trustee and the undersigned expressly covenant and agree to protect, defend, save harmless, and reimburse, with interest calculated at the maximum legal rate, the Company for all such additional amounts advanced. For the purposes of this paragraph, proof of mailing to the undersigned at the address listed below shall be deemed conclusive evidence of notice of demand, and said ten (10) day period shall commence to run on the third day following such date of mailing.

Where, in the Company's sole discretion, in order to remove and clear of record the aforesaid Exceptions to Title, it is necessary to dispose of pending litigation, the undersigned hereby confer irrevocable authority on the Company to settle or dismiss any counterclaim, cross claim, set-off or other prayer for affirmative relief which may be asserted in such, either by the undersigned or other parties claiming under them and expressly covenant and agree to protect, defend, save harmless, and secure the Company from any expense incurred thereby.

The Company shall be the sole judge as to the need for it to be represented by or have the advice of legal counsel of its own choosing and the undersigned shall be liable to the Company for fees and expenses so incurred.

The Trustee shall be under no duty to invest or reinvest any cash at any time held by it hereunder. The Trustee shall have the full right, power and authority to commingle any and all cash at any time constituting said deposit or part thereof with its own funds and all income derived from any use which the Trustee may make of any deposits hereunder shall belong to the Trustee. In the event the undersigned shall request the Trustee to invest the deposit for the benefit of the undersigned, the Trustee will furnish information concerning its investment procedures, and fee schedule. Authorization and direction by the undersigned to the Trustee for such investment shall be in writing, and to be effective, must be accepted in writing by the Trustee. Earnings, if any, less Trustee's fees, from said investment shall be added to and form a part of the trust, indemnity and security fund.

Unless directed otherwise, Escrow Trustee will deposit and hold Escrow Funds in an escrow account, together with similar funds from other transactions, at a FDIC insured trust company, bank, savings bank, savings association, or other financial services entity. It is understood and the parties hereby consent to Escrow Trustee depositing or transferring Escrow Funds into an interest-bearing escrow account, and that any interest earned, or other financial benefits received, on such account(s) shall be retained by Escrow Trustee.

## TRUST INDEMNITY AND SECURITY AGREEMENT WITH
## DEPOSIT OF FUNDS TO PROTECT AND SECURE
## AGAINST EXCEPTIONS TO TITLE
### (continued)

In case any of the Exceptions to Title are paid, discharged, satisfied, and are removed as such to the satisfaction of the Company (as to which the Company shall be the sole judge), and cleared of record, without the use of the said fund, or in case any surplus remains in the hands of the Trustee after it shall have reimbursed itself and the Company for all loss, damages, or disbursements, such fund or surplus, after deducting the costs, expenses, fees for services, and attorneys' fees, if any, of the Trustee and the Company, shall on demand and upon surrender to the Company of all receipts for disbursement, be paid or delivered to:

David Mann, Trustee of the Barbara J. Holmes Trust.

SSN/FEIN: _____

Neither the Trustee nor the Company shall be under any obligation of recognizing any assignment of the undersigned's rights under this agreement, until the original or a signed duplicate of the assignment, accepted in writing by the assignee, is deposited with and approved by the Trustee and the Company in writing.

The undersigned agrees that this Trust, Indemnity, and Security Agreement is not intended to give any benefits, rights, privileges, actions or remedies to any person, partnership, firm, or corporation other than the Company, the Trustee, the undersigned, and the insured, as a third party beneficiary or otherwise under any theory of law.

If this Trust, Indemnity, and Security Agreement is not terminated as hereinbefore provided on or before July 25, 2025, the Trustee shall thereafter charge a reasonable annual service or handling fee to be paid out of the fund.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

**INDEMNITOR(S):**

| | | |
|---|---|---|
| _____ | _____ | |
| Signature | Date | |
| _____ | Address: _____ | |
| Print Name | _____ | |
| | Phone: _____ | |
| | Email: _____ | |
| | | |
| _____ | _____ | |
| Signature | Date | |
| _____ | Address: _____ | |
| Print Name | _____ | |
| | Phone: _____ | |
| | Email: _____ | |

TI Agreement
ILD0039.doc / Updated: 06.03.24                    Page 3                    Printed: 07.15.25 @ 08:08 AM by
IL-CT-FSWA-01080.225410-25GSD284038WJ

49

## TRUST INDEMNITY AND SECURITY AGREEMENT WITH
## DEPOSIT OF FUNDS TO PROTECT AND SECURE
## AGAINST EXCEPTIONS TO TITLE
### (continued)

Chicago Title Insurance Company

|  |  |
|---|---|
| Signature | Date |

By: _____   Address: _____
         Print Name

         _____

Its: _____    Phone: _____
         Print Title

                                      Email: _____

TI Agreement
ILD0039.doc / Updated:  06.03.24   Page 4   Printed:  07.15.25 @ 08:08 AM by
IL-CT-FSWA-01080.225410-25GSD284038WJ

50

## EXHIBIT "A"

1.  Taxes for the year(s) 2022, 2023, 2024 and 2025
    2025 taxes are not yet due or payable.

1A.   Note: 2024 first installment was due March 4, 2025
    Note: 2024 final installment not yet due or payable

| Perm tax#         | Pcl    | Year | 1st Inst   | Stat   |
|-------------------|--------|------|------------|--------|
| 20-27-111-028-0000 | 1 of 1 | 2024 | $2,092.56  | Unpaid |

Perm tax# 20-27-111-028-0000  Pcl 1 of 1 Years 2022 and 2023 Volume 266

2A   The general taxes as shown below

| Year | Amount     |
|------|------------|
| 2023 | $ 3,804.65 |

The first estimated installment amounting to $2,018.55 is unpaid
The final installment amounting to $1,786.10 is unpaid

3A   The annual tax sale as shown below and interest, penalties, costs and
all charges, if any, accrued thereunder by reason of the payment of
subsequent general taxes or special assessments:

| | |
|---|---|
| Year: | 2022 |
| Date of sale: | 12/11/2024 |
| Amount: | $ 4,112.95 |
| Penalty: | 0.00% |
| Purchaser: | J.N.J. Gold Properties, Incorporation |

(Sale complete)

Note: An estimate of redemption can be obtained from the county clerk in
room 434 of the county building.

Note: To verify the taxpayer and redemption amount an estimate of the cost of redemption
can be obtained from the county clerk in room 434 of the county building.

The estimate of redemption to be paid through closing,  The taxes for 2023  and first installment of 2024 to be
paid at closing, ACH.  Funds will be released once the sale is cancelled and the subsequent taxes have been paid
and were not paid by tax purchaser.

TI Agreement
ILD0039.doc / Updated: 06.03.24                Page 5                Printed: 07.15.25 @ 08:08 AM by
IL-CT-FSWA-01080.225410-25GSD284038WJ

51



**CHICAGO TITLE COMPANY**

**STATEMENT REQUIRED FOR THE ISSUANCE OF ALTA OWNERS AND LOAN POLICIES**

**Commitment No.: 25GSD284038WJ**

**Loan No.:**

To the best knowledge and belief of the undersigned, the following is hereby certified with respect to the land described in the above commitment.

1. That, except as noted at the end of this paragraph, within the last six (6) months (a) no labor, service or materials have been furnished to improve the land, or to rehabilitate, repair, refurbish, or remodel the building(s) situated on the land; (b) nor have any goods, chattels, machinery, apparatus or equipment been attached to the building(s) thereon, as fixtures; (c) nor have any contracts been let for the furnishing of labor, service, materials, machinery, apparatus or equipment which are to be completed subsequent to the date hereof; (d) nor have any notices of lien been received, except the following, if any:

2. There are no revolving credit mortgages, line of credit mortgages, home equity loan mortgages or other voluntary liens or mortgages affecting title, other than those shown on Schedule B of the Commitment, except the following, if any:

3. That all management fees, if any, are fully paid, except the following:

4. That there are no unrecorded security agreements, leases, financing statements, chattel mortgages or conditional sales agreements in respect to any appliances, equipment or chattels that have or are to become attached to the land or any improvements thereon as fixtures, except the following, if any:

5. That there are no unrecorded contracts or options to purchase the land, except the following, if any:

6. That there are no unrecorded leases, easements or other servitudes to which the land or building, or portions thereof, are subject, except the following, if any:

7. That, in the event the undersigned is a mortgagor in a mortgage to be insured under a loan policy to be issued pursuant to the above commitment, the mortgage and the principal obligations it secures are good and valid and free from all defenses; that any person purchasing the mortgage and the obligations it secures, or otherwise acquiring any interest therein, may do so in reliance upon the truth of the matters herein recited; and that this certification is made for the purpose of better enabling the holder or holders, from time to time, of the above mortgage and obligations to sell, pledge or otherwise dispose of the same freely at any time, and to insure the purchasers or pledges thereof against any defenses thereto by the mortgagor or the mortgagor's heirs, personal representative or assigns.

The undersigned makes the above statement for the purpose of inducing Chicago Title Company, LLC to issue its owners or loan policy pursuant to the above commitment.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

**BUYER(S):**

Cash for Chicago Houses LLC

BY:_____

Subscribed and sworn to before me this _____ of

_____, _____.

_____
Notary Public

**SELLER(S):**

David Mann, as Successor-Trustee of the Barbara J. Holmes Trust u/a/d September 16, 1998

BY:_____

Subscribed and sworn to before me this _____ of

_____, _____.

_____
Notary Public

# STATEMENT REQUIRED FOR THE ISSUANCE
# OF ALTA OWNERS AND LOAN POLICIES
## (continued)

### LENDER'S DISBURSEMENT STATEMENT

The undersigned hereby certifies that the proceeds of the loan secured by the mortgage to be insured under the loan policy to be issued pursuant to the above commitment were fully disbursed to or on the order of the mortgagor on _____. You are hereby authorized to date down the above commitment to cover the date of said disbursement.

_____
Print Company Name

_____                    _____
Signature                                                              Date

By: _____
Print Name

Its: _____
Print Title

Statement Required For Issuance of ALTA
ILD0012.doc / Updated: 02.15.24                    Page 2                    Printed: 08.24.25 @ 02:53 PM by
IL-CT-FSWA-01080.225207-25GSD284038WJ

53

 **CHICAGO TITLE & TRUST.**

**AUTHORIZATION
FOR OUTGOING WIRES**

### THIS FORM MUST BE COMPLETED FOR ALL CUSTOMERS REQUESTING WIRE TRANSFERS

Due to recent changes in the Uniform Commercial Code, Chicago Title and Trust Company must have signed wire transfer instructions prior to sending any wire transfers to your account. Please complete, sign and date this form, specifying the wiring instructions for your bank account.

Reference (i.e. Escrow No., T.I. No., etc.): 25GSD284038WJ

Amount: $ _____

| FOR FED BANKS |
|---|

The undersigned customer hereby authorizes and directs Chicago Title and Trust Company to transfer funds by wire to the receiving bank and account identified below. Customer warrants that the information provided in this authorization is complete and accurate.

Receiving Bank: _____

City: _____   State: _____

ABA No.: _____

Party to Credit: David Mann, as Successor-Trustee of the Barbara J. Holmes
Trust u/a/d September 16, 1998

Account No. to Credit: _____

Phone Advise: _____
              Name                    Phone

Other Reference Info: _____

Additional Info: _____

| FOREIGN NON-FED BANKS | |
|---|---|
| **Intermediary** | **Correspondent** |
| NOTE: If the wire is to be rerouted through a domestic US intermediary bank for credit to your bank (i.e., your bank is not on-line with the FED), enter such intermediary bank information below. | NOTE: If your bank is outside the United States, the wire must be directed to a bank with a correspondent relationship in the United States. Contact your bank to obtain their correspondent bank information. |
| Name: _____ | Name: _____ |
| ABA No.: _____ | ABA No.: _____ |
| Account No.: _____ | Account No.: _____ |

Provided that the funds are wire transferred in accordance with these instructions, Chicago Title and Trust Company shall not be liable for any act or omission of any financial institution or any other person, nor shall Chicago Title and Trust Company have any liability for loss of funds or interest thereon. In no event will damages exceed interest at a rate equal to Fed Funds rate, adjusted daily, for the number of days that such funds are unavailable. The undersigned Customer shall indemnify and hold harmless Chicago Title and Trust Company, its successors or assigns, from any loss, liability and cost incurred as a result of any incorrect information supplied.

54

## AUTHORIZATION FOR OUTGOING WIRES
(continued)

In no event shall Chicago Title and Trust Company be liable for any special, consequential, indirect or incidental damages, regardless of whether any claim is based on contract or tort or whether the likelihood of such damage was known to Chicago Title and Trust Company.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

ACCEPTED AND AGREED:

David Mann, as Successor-Trustee of the Barbara J. Holmes Trust u/a/d September 16, 1998

BY:_____        _____
                                             Date

Phone: _____

Outgoing Wire Authorization
WID0004.doc / Updated: 05.29.20                Page 2                Printed: 06.24.25 @ 02:53 PM by
                                                                   IL-CT-FSWA-01080.225207-25GSD284038WJ

55

# MORTGAGE AFFIDAVIT

STATE OF _____

COUNTY OF _____

**Order No.:** 25GSD284038WJ
**Property:** 7238 S King Dr
Chicago, IL 60619

There is currently no mortgage loan for the above referenced property. The property is free and clear.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

Subscribed and sworn to before me this _____ of _____, _____.

_____
Notary Public

56

 **CHICAGO TITLE & TRUST.**

**REAL ESTATE REPORTING
SOLICITATION**

**Escrow No.:** 25GSD284038WJ
**Date:** June 24, 2025

**Settlement Date:**
**Property:** 7238 S King Dr
Chicago, IL 60619

You are required by law to furnish your correct taxpayer identification number, and other information, to the "Settlement Agent" as defined in Section 6045(e) of the Internal Revenue Code, for purposes of 1099S information reporting on real estate transactions. Accordingly, information regarding this transaction will be sent to the Internal Revenue Service and State Franchise Tax Board. Failure to provide the settlement agent, Chicago Title and Trust Company, with your correct taxpayer identification number could result in civil or criminal penalties as imposed by law. Should you have any questions regarding the information reporting requirements of this section, you are advised to consult with your attorney, tax advisor or the Internal Revenue Service.

**SELLER'S NAME: (enter surname first)**

1. _____

2. _____

**SELLER'S ADDRESS AFTER CLOSE:**

3. Address: _____

4. City: _____

5. State: _____ 6. Zip: _____

**TAXPAYER IDENTIFICATION NUMBER:** (for the name shown at line 1. above)

Employer Identification No.: 7. __ __ - __ __ __ __ __ __ __
- OR -
Social Security No.: 8. __ __ __ / __ __ / __ __ __ __

### ALLOCATION FOR MULTIPLE TRANSFERORS

If you are ONE of multiple transferors/sellers in this transaction, you can choose to allocate your individual share of "Gross Proceeds" for 1099S reporting. (i.e. 50% share or interest) Transferors who are husband and wife at the time of closing, may be treated as a single transferor. Complete one of the following selections:

For 1099S reporting purposes, the allocation to be used on my behalf in this transaction is:

(a) _____ % share of the total gross proceeds
- OR -
(b) The amount of $_____

*NOTE: If, at the closing, there is an unresolved conflict of the allocation between multiple transferors or the combined allocations do not total 100% of the reportable gross proceeds, the settlement agent must report the entire gross proceeds for EACH transferor on each return of information required to be filed. No subsequent corrections or amended 1099S forms will be issued to the transferors under these conditions.*

# REAL ESTATE REPORTING SOLICITATION
### (continued)

### CERTIFICATION:

Under penalties of perjury, I/we certify that the number shown on this form is my correct taxpayer identification number.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

_____          _____
Signature                                                        Date

_____
Print Name

_____          _____
Signature                                                        Date

_____
Print Name

1099 Solicitation (Entity)
ILD0190.doc / Updated: 02.02.23                    Page 2                    Printed: 06.24.25 @ 02.52 PM by
IL-CT-FSWA-01080.225207-25GSD284038WJ

58

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT E**
Recorded Memorandum of Contract Clouding Title â€" image at p. 58

Doc#. 2519622258 Fee: $107.00
MONICA GORDON
COOK COUNTY CLERK'S OFFICE
Date 7/15/2025 1:59 PM Pg 1 of 2

**STATE OF ILLINOIS**    )

**COUNTY OF COOK**    )

**TO:**

The claimant, CASH FOR CHICAGO HOUSES, of Chicago, County of Cook, State of Illinois, hereby files and records this real estate contract setting forth its interest in the aforementioned property and against Owner of Record, David Mann, as Successor Trustee of the Barbara J. Holmes Trust u/a/d September 16, 1998, (hereinafter referred to as Owners) of 7238 S King Drive, Chicago, Cook County, Illinois and states:

       That on May 30, 2025, the owner owned the following described land in the County of Cook, State of Illinois to wit:

LOT FOUR (4) (EXCEPT NO. 66.8 FEET) BLOCK SIX IN PRESCOTT'S SUBDIVISION OF EAST ONE HALF (1/2) NORTH WEST ONE QUARTER (1/4) SECTION TWENTY-SEVEN (27), TOWNSHIP THIRTY EIGHT (38) NORTH, RANGE FOURTEEN (14), EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 20-27-111-028-0000

Address(es) of premises: 7238 S King Drive, Chicago, IL 60619

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT F**
ALTA Settlement Statement (Network Title, July 22, 2025) â€" Buyer: MBE Financial Group, Inc.; Sale Price: $120,000; Net to Seller $98,379.11 â€" see pp. 60â€"62

| American Land Title Association | ALTA Settlement Statement - Cash<br>Adopted 05-01-2015 |
| --- | --- |

**NETWORK TITLE LLC**
**ALTA Universal ID: 1171934**
**8833 GROSS POINT ROAD SUITE 208**
**SUITE 208**
**Skokie, IL 60077**

| | |
| --- | --- |
| File No./Escrow No.: | 25070717 |
| Print Date & Time: | July 22, 2025 12:22 pm |
| Officer/Escrow Officer: | NETWORK TITLE |
| Settlement Location: | 8833 GROSS POINT ROAD SUITE 208, SUITE 208<br>Skokie, IL 60077 |
| Property Address: | 7238 S KING DR<br>Chicago, IL 60619 |
| Buyer: | MBE FINANCIAL GROUP, INC.<br>122 GRAYMOOR LN<br>Olympia Fields, IL 60461 |
| Seller: | DAVID MANN AS SUCCESSOR TRUSTEE OF THE BARBARA J HOLMES TRUST DATED 9/18/<br>1998<br>1255 S MICHIGAN AVE APT 601<br>Chicago, IL 60605 |
| Settlement Date : | July 22, 2025 |
| Disbursement Date : | July 22, 2025 |

| Seller | | Description | Buyer | |
| --- | --- | --- | --- | --- |
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Financial** | | |
| | 120,000.00 | Sale Price of Property | 120,000.00 | |
| | | | | |
| | | **Prorations/Adjustments** | | |
| 1,712.09 | | 2024 2ND INSTALL PRORATION<br>07/01/24-12/31/24 | | 1,712.09 |
| 2,115.26 | | County Taxes<br>01/01/25-07/22/25 | | 2,115.26 |
| | | | | |
| | | **Title Charges and Escrow/Settlement Charges** | | |
| | | Closing Fee (IL PURCH) to NETWORK TITLE LLC | 1,450.00 | |
| | | CPL (Buyer) to Fidelity National Title Insurance Company | 25.00 | |
| | | CPL Fee to Fidelity National Title Insurance Company | 50.00 | |
| 100.00 | | Obtain Estimate of Redemption to NETWORK TITLE LLC | | |
| | | Owner's Title Insurance to NETWORK TITLE LLC | 1,750.00 | |

Copyright 2015 American Land Title Association
All rights reserved

| Seller Debit | Seller Credit | Description | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Title Charges and Escrow/Settlement Charges (continued)** | | |
| | | Coverage: $120,000.00 Premium: $1,750.00 Version: ALTA Owner's Policy (2021) | | |
| | | Policy Update Fee to NETWORK TITLE LLC | 175.00 | |
| 125.00 | | Process REDEMPTION/OPEN ITEMS to NETWORK TITLE LLC | | |
| | | Recording Service Fee to NETWORK TITLE LLC | 50.00 | |
| | | State of Illinois Policy Fee to Fidelity National Title Insurance Company | 3.00 | |
| 50.00 | | Tax Payment Service Fee to NETWORK TITLE LLC | | |
| 200.00 | | TI Fee to NETWORK TITLE LLC | | |
| | | WATER/ZONING FEE to NETWORK TITLE LLC | 100.00 | |
| | | Wire Transfer Fee to NETWORK TITLE LLC | 50.00 | |
| 1,000.00 | | TI TO SECURE REDEMPTION 2022 TAXES to NETWORK TITLE LLC | | |
| | | | | |
| | | **Government Recording and Transfer Charges** | | |
| | | Recording Fees-Estimate to NETWORK TITLE RECORDING ACCOUNT | 107.00 | |
| | | County Transfer Tax to NETWORK TITLE RECORDING ACCOUNT | 60.00 | |
| | | Municipal Transfer Tax to City of Chicago | 1,260.00 | |
| | | State Transfer Stamps to NETWORK TITLE RECORDING ACCOUNT | 120.00 | |
| | | | | |
| | | **Miscellaneous** | | |
| 4,230.83 | | 2023 FULL YEAR TAXES W/PEN to NETWORK TITLE TAX PAYMENT ACCOUNT 20-27-111-028-0000 | | |
| 2,179.01 | | 2024 1ST INSTALL TAXES W/PEN to City of Chicago - Water Dept 20-27-111-028-0000 | | |
| | | ATTORNEY FEE to SHARON ROOS KIRKPATRICK | 600.00 | |
| 55.00 | | EOR INVOICE to CLAS CLERKING STGSD280438 | | |
| 5,335.56 | | FCP FINAL WATER CERT READY to City of Chicago - Water Dept | | |
| | | INVOICE FOR ZONING to CLAS CLERKING ZCGSD284038 | 170.00 | |

Copyright 2015 American Land Title Association
All rights reserved

| Seller | | Description | Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | Miscellaneous (continued) | | |
| 4,518.14 | | REDEEM 2022 SOLD TAXES to Cook County Clerk<br>    20-27-111-028-0000 | | |
| | | SURVEY FEE to URCHELL AND ASSOCIATES<br>    2506021 | 575.00 | |

| Seller | | | Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| 21,620.89 | 120,000.00 | **Subtotals** | 126,545.00 | 3,827.35 |
| | | **Due from Buyer** | | 122,717.65 |
| 98,379.11 | | **Due to Seller** | | |
| 120,000.00 | 120,000.00 | **Totals** | 126,545.00 | 126,545.00 |

Copyright 2015 American Land Title Association
All rights reserved

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For
Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay
Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause;
Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT G**
Mutual Release and Non-Disparagement Agreement â€" pp. 64â€"66

## MUTUAL RELEASE AGREEMENT

This Mutual Release Agreement ("Agreement") is entered into as of the date below by and between David Mann, as Successor Trustee of the Barbara J. Holmes Trust dated September 16, 1998 ("Releasor"), and Cash for Chicago Houses LLC, Brendan McElhaney, Abel Lopez, Castle Law, Castle Title Services LLC, including its employees, Gary Davidson, William Lohrman, Brian Krause, and John Curran ("Releasees").

WHEREAS, disputes and claims have arisen between the Releasor and the Releasees regarding the property located at 7238 South King Drive, Chicago, IL 60619, and other related matters;

WHEREAS, the parties desire to fully and finally resolve all disputes, claims, and causes of action between them, whether known or unknown, arising out of or related to the aforementioned property and any other matters;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Releasees agree to release the recorded memorandum of contract for the above referenced property and will allow the sale of the above mentioned property to a third party and deliver the same to Network Title for recording in the transaction prior to or at closing.

2. The Releasor, on behalf of himself, the Barbara J. Holmes Trust dated September 16, 1998, and any successors, assigns, agents, or representatives, hereby irrevocably and unconditionally releases, acquits, and forever discharges the Releasees, including their officers, directors, employees, agents, successors, and assigns, from any and all claims and demands, rights and causes of action of any kind, including costs and expenses of litigation, whether recoverable at the common law or pursuant to statute, the undersigned now have, or hereafter may have on account of, or in any way growing of any and all known and unknown claims or damages, arising out of or related to the real estate transaction involving the property located at 7238 South King Drive, Chicago, IL 60619, or any other matter between the parties.

3. The Releasees, on behalf of themselves, their officers, directors, employees, agents, successors, and assigns, hereby irrevocably and unconditionally release, acquit, and forever discharge the Releasor, including the Barbara J. Holmes Trust dated September 16, 1998, and any successors, assigns, agents, or representatives, from any and all claims and demands, rights and causes of action of any kind, including costs and expenses of litigation, whether recoverable at the common law or pursuant to statute, the undersigned now have, or hereafter may have on account of, or in any way growing of any and all known and unknown claims or damages, arising out of or related to the real estate transaction involving the property located at 7238 South King Drive, Chicago, IL 60619, or any other matter between the parties.

4. The parties agree that the terms of this Agreement and the circumstances surrounding its execution shall remain confidential and shall not be disclosed to any third party, except as required by law or as necessary to enforce the terms of this Agreement.

5. The parties agree that they shall not, directly or indirectly, make, publish, or communicate to any person or entity any disparaging, defamatory, or negative remarks, comments, or statements concerning the other party, including but not limited to their officers, directors, employees, agents, successors, assigns, or affiliates.

6. This Agreement shall not be construed as an admission of liability or wrongdoing by any party. Each party expressly denies any liability or wrongdoing in connection with the matters released herein.

7. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflict of laws principles.

8. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, and understandings, whether written or oral.

9. If any provision of this Agreement is found to be invalid, illegal, or unenforceable, the remaining provisions shall remain in full force and effect.

10. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Electronic signatures shall be deemed valid and enforceable.

11. The parties acknowledge that they have read and understand this Agreement, and that they execute it voluntarily and without duress.

IN WITNESS WHEREOF, the parties have executed this Mutual Release Agreement as of the date written below.

RELEASOR:
David Mann, as Successor Trustee of the Barbara J. Holmes Trust dated September 16, 1998
Signature: _____
Date: _____

SELLERS SIGNATURE PAGE TO FOLLOW

RELEASEES:

Cash for Chicago Houses LLC
By:

_____
Title: _____
Date: _____

Brendan McElhaney
Signature: _____
Date: _____

Abel Lopez
Signature: _____
Date: _____

Castle Law
By:

_____
Title: _____
Date: _____

Castle Title Services LLC
By: _____
Title: _____
Date: _____

Gary Davidson
Signature: _____
Date: _____

William Lohrman
Signature: _____
Date: _____

Brian Krause
Signature: _____
Date: _____

John Curran
Signature: _____
Date: _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT H**

Photographs of Pre-Notarized Pages and "Signed Under Protest" — pp. 68–69 (Robin Remke)

 **CHICAGO TITLE COMPANY**

**STATEMENT REQUIRED FOR THE ISSUANCE OF ALTA OWNERS AND LOAN POLICIES**

Commitment No.: 25GSD284038WJ                                                      Loan No.:

To the best knowledge and belief of the undersigned, the following is hereby certified with respect to the land described in the above commitment.

1. That, except as noted at the end of this paragraph, within the last six (6) months (a) no labor, service or materials have been furnished to improve the land, or to rehabilitate, repair, refurbish, or remodel the building(s) situated on the land; (b) nor have any goods, chattels, machinery, apparatus or equipment been attached to the building(s) thereon, as fixtures; (c) nor have any contracts been let for the furnishing of labor, service, materials, machinery, apparatus or equipment which are to be completed subsequent to the date hereof; (d) nor have any notices of lien been received, except the following, if any:

_____

2. There are no revolving credit mortgages, line of credit mortgages, home equity loan mortgages or other voluntary liens or mortgages affecting title, other than those shown on Schedule B of the Commitment, except the following, if any:

_____

3. That all management fees, if any, are fully paid, except the following:

_____

4. That there are no unrecorded security agreements, leases, financing statements, chattel mortgages or conditional sales agreements in respect to any appliances, equipment or chattels that have or are to become attached to the land or any improvements thereon as fixtures, except the following, if any:

_____

5. That there are no unrecorded contracts or options to purchase the land, except the following, if any:

_____

6. That there are no unrecorded leases, easements or other servitudes to which the land or building, or portions thereof, are subject, except the following, if any:

_____

7. That, in the event the undersigned is a mortgagor in a mortgage to be insured under a loan policy to be issued pursuant to the above commitment, the mortgage and the principal obligations it secures are good and valid and free from all defenses; that any person purchasing the mortgage and the obligations it secures, or otherwise acquiring any interest therein, may do so in reliance upon the truth of the matters herein recited; and that this certification is made for the purpose of better enabling the holder or holders, from time to time, of the above mortgage and obligations to sell, pledge or otherwise dispose of the same freely at any time, and to insure the purchasers or pledges thereof against any defenses thereto by the mortgagor or the mortgagor's heirs, personal representative or assigns.

The undersigned makes the above statement for the purpose of inducing Chicago Title Company, LLC to issue its owners or loan policy pursuant to the above commitment.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

BUYER(S):                                                         SELLER(S):

Cash for Chicago Houses LLC                                       David Mann, as Successor-Trustee of the Barbara J. Holmes Trust
                                                                 u/a/d September 16, 1998

BY:_____                                       BY:_____

Subscribed and sworn to before me this _____ of                 Subscribed and sworn to before me this 16th of
                                                                 July 2025
_____, _____.

_____                                          _____
Notary Public                                                    Notary Public

```
Official Seal
ROBYN MARIE REMKE
Notary Public, State of Illinois
Commission No. 1012063
My Commission Expires June 16, 2029
```

Statement Required For Issuance of ALTA

MASTER STATEMENT - Continued

| SELLER | | | BUYER | |
| $ DEBITS | $ CREDITS | | $ DEBITS | $ CREDITS |
|---|---|---|---|---|
| | | **TITLE & ESCROW CHARGES** | | |
| | | (Residential) to Castle Title Services, Inc. | | |
| | | Policies to be issued: | | |
| | | Owners Policy | | |
| | | Coverage: $120,000.00     Premium: | | |
| | | $2,150.00 | | |
| | | Version: ALTA Owner's Policy 2021 | | |
| | | **GOVERNMENT CHARGES** | | |
| | | Recording Fees to Cook County Recorder | 107.00 | |
| 0.00 | | City Transfer Tax to MYDEC Chicago Transfer Stamps | 1,260.00 | |
| 0.00 | | County Transfer Tax ($60.00) to MYDEC Cook County Transfer Stamps | 60.00 | |
| 0.00 | | State Transfer Tax to MYDEC Cook County Transfer Stamps | 120.00 | |
| | | **MISCELLANEOUS CHARGES** | | |
| 2,171.01 | | 1st Inst 2024 County Taxes to ACH Cook County Taxes | | |
| | | 20-27-111-028-0000 | | |
| 4,222.83 | | 2023 County Taxes to ACH Cook County Taxes | | |
| | | 20-27-111-028-0000 | | |
| | | CLAS Fee for EOR to CLAS Clerking | 55.00 | |
| 5,347.90 | | CLAS Water Cert to CLAS Clerking | | |
| | | Commission - Selling to Keller Williams Preferred Realty | 500.00 | |
| 14.50 | | Duplicate Tax Bill Fee + $.50 Service Fee to ACH Cook County Taxes | | |
| 4,518.14 | | EOR for Sold Taxes to Cook County Clerk | | |
| 11,375.41 | | Lien Payoff to Illinois Dept of Revenue | | |
| | | Payment as Directed to Chicago Houses LLC | 43,695.00 | |
| | | Seller Attorney Fee to Castle Legal | 750.00 | |
| | | Survey to Urchell and Associates, Inc | 575.00 | |
| | | Zoning to CLAS Clerking | 170.00 | |
| 34,292.16 | 120,000.00 | Subtotals | 171,970.00 | 3,692.37 |
| | | Balance Due FROM Buyer | | 168,277.63 |
| 85,707.84 | | Balance Due TO Seller | | |
| 120,000.00 | 120,000.00 | TOTALS | 171,970.00 | 171,970.00 |

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

SELLER:                                                    BUYER:

David Mann, as Successor-Trustee of the Barbara J.        MBE Financial Group Inc.
Holmes Trust u/a/d September 16, 1998

BY: _____  -Signed under protest          BY: _____
                        And with Full Reservation
                        Of Rights pursuant to UCC 1-308

Page 2 of 3                                           (25GSD284036WJ/113) July 15, 2025 11:52 AM

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**
v.
Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT I**
July 5, 2025 Addendum â€" confirms $165,000 purchase price and July 18, 2025 closing

## ADDENDUM TO PURCHASE AGREEMENT

This Addendum, dated July 05, 2025, is incorporated into and modifies the original Purchase Agreement dated May 30, 2025, between Barbara Holmes Trust (Seller) and Cash For Chicago Houses (Buyer) for the property located at 7238 S King Dr, Chicago, IL 60619.

1. Expiration of Prior Addendum: The prior addendum sent to Buyer with a purchase price of $150,000 has expired without signature and is hereby superseded and void.

2. Revised Purchase Price: Due to Buyer's non-performance and delay, the purchase price is revised to $165,000.

3. Execution Deadline: Buyer must sign and return this Addendum by Friday, July 12, 2025, at 11:59 PM CST. Failure to execute and return this Addendum by the stated deadline will result in Seller pursuing legal action for breach of contract due to non-performance.

Seller: _____     Date: _____

Barbara Holmes Trust

Buyer: _____     Date: _____

Cash For Chicago Houses

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Case No. _____**

**David Mann, Plaintiff,**

v.

Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

**EXHIBIT J**

July 12, 2025 Final Supersession Memorandum â€" confirms $165,000 and tacit acceptance by conduct

## David Mann, as Trustee of the Barbara Holmes Trust

**TO:**                                                                                          **July 12, 2025**
Cash for Chicago Houses LLC

**File No: 25GSD284038WJ Property Address: 7238 S King Dr, Chicago, IL 60619
Title Company: Chicago Title**

This Supersession Memorandum supersedes and replaces all prior addenda, correspondence, or implied agreements between the parties, including the July 3rd addendum and the May 30th original agreement, to the extent inconsistent with the terms herein.

This document shall serve as the final written offer and procedural remedy issued by the Seller, for the purposes of: • Clarifying terms, • Curing procedural breach, • Restoring contractual clarity, • Preserving Seller's legal rights under Illinois law.

• Purchase Price: $165,000 • Closing Deadline: Monday, July 14, 2025 • Buyer must confirm readiness to close in writing by 12:00 PM CST • Closing must occur by 5:00 PM CST same day • Conditions to Close: - Buyer may only close via assignment to a capable end buyer - Buyer must submit an executed HUD or ALTA settlement statement showing proof of end buyer - Buyer responsible for all closing costs - Chicago Title is designated title company unless formally reassigned

By acceptance or conduct pursuant to this Memorandum: • Buyer waives any and all rights to specific performance under the May 30th agreement • Buyer agrees not to record or threaten a memorandum of contract • Buyer acknowledges Seller's standing to initiate legal action for slander of title, malicious interference, or breach damages

The Seller hereby places on record that: • Between July 5 and July 8, Buyer's conduct met the threshold of tacit contractual acceptance under Illinois case law • Buyer's rejections issued after the cure window were legally invalid, and are estopped due to prior behavior and failure to formally reject in the required timeframe

Buyer publicly advertised the property as "assignable" via Facebook on June 5, 2025, in violation of oral representations made to the Seller during negotiation. This constitutes material misrepresentation and is preserved as part of the breach file. (Reference Screenshot Appendix if attached.)

In the event Buyer fails to close by the stated deadline, Seller reserves the right to pursue: • Release of Earnest Money Deposit • Specific Performance or compensatory relief • Temporary Restraining Order against slander of title • Civil and Chancery claims for anticipatory breach, interference, and fraud

No part of this memorandum, nor the act of offering revised terms, shall constitute waiver of any legal right, breach claim, or remedy available to Seller under Illinois law.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**Case No. _____**

**David Mann, Plaintiff,**

v.

Chicago Title Insurance Company; Castle Law Firm, LLC; Castle Title Services, LLC; Cash For Chicago Houses, LLC; Richard Wagner; Nicole Holloway; Therese Mark-Hansen; Jay Spreadbury; Robin Remke; John Curran; Gary Davidson; William Lohrman; Brian Krause; Brendan McElhaney; Abel Lopez; and JOHN/JANE DOES 1-25, Defendants.

## EXHIBIT K

July 2025 Email Communications (Native .eml) â€" Selected .eml messages and attachments (July 14â€"19, 2025) evidencing extortionate conduct by Lohrman, Krause, and McElhaney, and Plaintiffâ€™s cease-and-desist to Abel Lopez; utility-control correspondence.